IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
WESTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | |
|     Plaintiff, | |
| v. | Cr. No. 2:25cr20032-SHL |
| SANJEEV KUMAR, | |
|     Defendant. | |

**SANJEEV KUMAR, M.D.'S RULE 16 EXPERT WITNESS DISCLOSURE**

Defendant, Sanjeev Kumar, by and through his counsel, gives notice pursuant to Federal Rules of Criminal Procedure 16(b)(1)(C) of his intent to introduce the testimony of Sean M. Weiss, CHC, CEMA, CMCO, CPMA, CPC-P, CPC, CMC, CMIS, CMOM as an expert witness in this matter.

Mr. Weiss is a healthcare regulatory compliance professional with over thirty (30) years of experience in regulatory oversight, auditing, and litigation support under statutes such as the False Claims Act (31 U.S.C. §§ 3729–3733) and CMS guidelines. He currently serves as Partner and Vice President of Strategic Litigation Services and Regulatory Affairs for DoctorsManagement, LLC, where he has been employed since December 2012.

During his overall career, he has engaged with various members (including prosecutors and the head of the Criminal Division who have endorsed him as a regulatory compliance expert) at the Department of Justice, Special Agents at the Federal Bureau (FBI), Investigators/Special Agents at the Office of Inspector General (OIG), the Centers for Medicare and Medicaid Services, including their contractors (Unified Program Integrity Contractors (UPIC), Recovery Audit

Document ID: 664f3e4a7a8b9b8d6ad969dd22a544e064c43acd0adb2e299398bd9614ef3c00

Contractors (RACs), Medicare Administrative Contractors (MACs), Supplemental Medical Review Carrier (SMRC), etc.).

Additionally, he has served as an independent investigator for The North Carolina Medical Board regarding Fraud, Waste and Abuse. He has engaged in hundreds of Medicare Administrative Law Judge Reviews during his career dating back to 1996. He has testified in dozens of state/federal civil and criminal cases and served as a subject matter expert for the Attorney General (State of Texas). He currently serves as an Independent Review Organization or Compliance Expert Approved by The Office of Inspector General overseeing Corporate Integrity Agreements entered into by defendants as part of a settlement agreement.

Mr. Weiss holds nine National Board Certifications in Auditing, Billing, Coding, Regulatory Compliance, and Practice Management. He is a frequent guest speaker (including Keynote Address) at specialty societies, management associations, billing and coding academies, the American Health Law Association and University/Medical Schools.

In his current role within DoctorsManagement, he serves as the Compliance Officer or Chief Compliance Officer for several healthcare entities across the country including the nation's second largest critical access hospital, the largest orthopedic groups in the country, the largest behavioral health group in the country and the largest Rheumatology Management Service Organization (MSO) in the country.

His curriculum vitae and expert report has been produced with Defendant's discovery production to the Government.

This report does not include a complete recitation of Mr. Weiss's testimony, and he may offer additional testimony or opinions during trial. Additionally, he reserves the right to supplement

Document ID: 664f3e4a7a8b9b8d6ad969dd22a544e064c43acd0adb2e299398bd9614ef3c00

his report as necessary if additional information becomes known. Any additional opinions will be disclosed no later than 28 days before trial, pursuant to Local Rule 16.1(c)(2).

Based on his review, training, experience, and expertise, Mr. Weiss will provide testimony regarding the following topics:

### I. There are No National Coverage Determination (NCD) or Local Coverage Determination (LCD) for CPT 58558

1. CMS has no National Coverage Determination (NCD) or Local Coverage Determination (LCD) for CPT 58558 (hysteroscopy with biopsy).

2. NCDs are guidelines set forth by CMS that generally define the parameters for Medicare's coverage on certain claims. LCDs apply to a specific geographic area and are determined by Medicare Administrative Contractors (MACs).

3. LCDs vary depending on location, but generally require medical necessity documentation (42 C.F.R. § 405.1060).

4. Absent specific LCDs, payments proceed based on Medicare's Physician Fee Schedule (PFS), or the Outpatient Prospective Payment System (OPPS).

### II. Payment for CPT 58558 is Not Based on the Type of Scope Used

5. Medicare's reimbursements for hysteroscopies (CPT 58558) is not related to the type of scope used for the procedure.

6. This procedure's reimbursement is fixed per CPT code and does not vary by single-use or reusable scopes, as CMS pays bundled rates without device-specific adjustments. (42 C.F.R. § 419.66 for pass-through, but scopes rarely qualify.)

7. The reason endoscopes (scopes) rarely qualify for pass-through payments under 42 C.F.R. § 419.66 is that they do not meet the strict eligibility requirement of being a single-use, surgically implanted or inserted device.

3

Document ID: 664f3e4a7a8b9b8d6ad969dd22a544e064c43acd0adb2e299398bd9614ef3c00

8. Instead, they are classified as reusable capital equipment, a category specifically excluded from pass-through payment eligibility. Single-use scopes don't always reduce reprocessing costs but likewise, they do not increase reimbursements; billing remains uniform.

9. As noted, CPT-based payments ignore single-use vs. reusable distinctions; facilities absorb device costs within bundled rates (CMS NCCI Manual, Ch. 7).

### III. Costs to Medicare are Significantly Cheaper if Hysteroscopy/Biopsy is Performed in Office as Opposed to a Hospital

10. Medicare's overall payments for CPT 58558 performed in an outpatient setting vs. hospital are lower.

    a. In a hospital outpatient setting, CPT codes for hysteroscopy are grouped into Ambulatory Payment Classifications (APCs) under the Outpatient Prospective Payment System (OPPS), providing a bundled rate (42 C.F.R. § 419.31). For example, diagnostic hysteroscopy (CPT 58555) falls under APC 5413, with a 2025 national unadjusted payment of approximately $1,500, irrespective of time. To put this into laymen's terms, all of the portions of this diagnostic CPT code are bundled into one payment regardless of what transpires during the procedure as long as those portions are considered an integral part of the procedure. Again, the payment is not based on any duration of time that it takes to perform.

    b. In office settings, payments use Relative Value Units (RVUs) under the Physician Fee Schedule (PFS), multiplied by a conversion factor (e.g., $33.29 for CY 2025) and adjusted geographically (42 C.F.R. § 414.20). CPT 58558 (hysteroscopy with biopsy) has about 5.5 work RVUs, yielding roughly $183 professional fee, bundled regardless of duration. To put this in perspective, there are RVUs that make up the professional (physician work), the practice expense (cost to provide the service), and the malpractice cost(s) associated with performing this procedure. Those three separate RVUs get added together to make a "Total RVU", which is then adjusted to the geographical region (i.e., New York City), which can either raise or lower the Total RVU and then it is multiplied by the Conversion Factor established by Congress each year, which provides the total fee paid to the provider for the professional services portion.

11. Typical hysteroscopy durations are influenced by clinical variables, not CMS mandates, per American College of Obstetricians and Gynecologists (ACOG) guidelines and peer-reviewed studies. CMS audits focus on volume patterns via MUEs, flagging "medically

4

unbelievable days" (e.g., billing >1-2 hysteroscopies per session if exceeding MUE limits of 1 unit per day for CPT 58558).

IV. **There is Always a Difference Between the "Billed Rate" and the "Reimbursed Rate."**

12. There will almost always be a difference between the "billed rate" and the "reimbursed rate" in Medicare billing.

13. Under Medicare's Physician Fee Schedule (PFS), the billed rate represents the provider's self-determined charged amount often referred to as the practice rate, which can be somewhat inflated, to account for operational costs, negotiations with private payers, and potential discounts.

14. In contrast, the reimbursed rate is CMS's predetermined allowable amount, calculated using Relative Value Units (RVUs) multiplied by the PFS conversion factor (set at $32.3465 for CY 2025) and adjusted for geographic practice cost indices (GPCIs) under 42 U.S.C. § 1395w-4 and 42 C.F.R. § 414.20. For CPT 58558, the national unadjusted allowable under the 2025 PFS is approximately $183 for the professional component (based on 5.5 work RVUs), though this can range from $300–$500 when including facility fees or adjustments, with Medicare covering 80% after the beneficiary meets the Part B deductible.

15. Providers who participate in Medicare and accept assignment (as required for most under 42 U.S.C. § 1395w-4(g)) agree to accept this allowable as full payment, prohibiting balance billing the beneficiary for any excess beyond the 20% coinsurance and deductible.

16. A provider sets what they believe to be a Usual and Customary Rate (UCR) but irrespective of that billed rate CMS is only going to pay up to the allowed amount for that procedure based on the RBRVS and then 80% of the allowed amount leaving a 20% cost share for the

5

patient or for their secondary (medigap if they have one) insurance to pay the remaining balance of the allowed amount.

17. Providers' charged amounts are invariably higher than Medicare allowable because they are strategically set in their practice fee schedule to maximize reimbursement for services performed from private insurers, who often negotiate payments at 105% to 300% of Medicare rates, allowing room for discounts, contractual adjustments, and coverage of uncompensated care or administrative costs not fully reimbursed by government payers.

18. Ultimately, the specific billed amount does not materially affect Medicare reimbursement for assignment-accepting providers, as CMS pays solely based on the fixed allowable rate regardless of the charge submitted (CMS Medicare Claims Processing Manual, Ch. 1, § 30.3.12), rendering the billed figure largely irrelevant except in non-participating scenarios.

**V.    CMS Policy on Use of Scribes.**

19. The prosecution expert's opinion posits that a human scribe utilized by a healthcare provider for documenting patient encounters must be physically present in the examination room or connected via audio to ensure appropriate and accurate documentation, with the provider subsequently responsible for reviewing the record for billing, care continuity, and historical accuracy.

20. While the latter aspect regarding the provider's review responsibility aligns with established Medicare documentation principles, the assertion that the scribe "needs to be in the room, whether personally or via audio" introduces a prescriptive requirement not supported by Centers for Medicare & Medicaid Services (CMS) guidelines. This renders

6

the opinion inherently flawed, as it elevates a preferred practice to an implied regulatory mandate without basis in authoritative sources.

21. CMS does not provide comprehensive official guidance specifically addressing the operational use of medical scribes, including their physical or virtual presence during encounters. Instead, CMS policies emphasize the treating provider's ultimate accountability for authenticating and ensuring the accuracy of medical record entries, regardless of who performs the initial documentation. For instance, under the Medicare Program Integrity Manual, scribes are explicitly characterized as non-providers of services, and CMS clarifies that "when a scribe is used by a provider in documenting medical record entries (e.g., progress notes), CMS does not require the scribe to sign/date the documentation. The treating physician's/non-physician practitioner's (NPP's) signature on a note indicates that the physician/NPP affirms the note adequately documents the care provided." This framework underscores that the provider's attestation serves as the key compliance mechanism, without imposing locational constraints on the scribes.

22. Medicare Administrative Contractors (MACs), which implement CMS policies at the regional level, similarly refrain from mandating in-room or audio presence for scribes. Guidance from contractors such as CGS Medicare and Novitas Solutions describes scribes as ancillary personnel who may document entries "upon dictation by the physician" or as a "living recorder" capturing real-time details, but these descriptions do not preclude remote or virtual arrangements so long as the documentation reflects the encounter accurately and is provider-verified.

23. Secondary analyses from compliance resources, including those from the American Academy of Professional Coders (AAPC), reinforce that while real-time documentation

7

during the encounter is ideal to avoid post-hoc additions (which may not qualify as scribing), there is no explicit prohibition on remote methods, such as virtual scribes listening via secure audio feeds, provided HIPAA and other privacy standards are met. Industry practices, including the widespread adoption of virtual scribing services compliant with Medicare reimbursement rules, further illustrate that locational presence is not a barrier to regulatory adherence.

## VI. Crossover Claims

24. Claims for beneficiaries who have both Medicare and Medicaid (or other secondary) insurance are also known as crossover claims. As a regulatory compliance professional with extensive experience in healthcare law and Medicare program integrity, Mr. Weiss will provide a detailed explanation of how Medicare claims cross over to secondary payers seamlessly, drawing on statutory authority under the Medicare Secondary Payer (MSP) provisions (42 U.S.C. § 1395y(b)) and implementing regulations in the Medicare Claims Processing Manual (Chapter 28). This process is not only compliant, but also appropriate, as it ensures efficient coordination of benefits (COB), prevents duplicate payments, and aligns with federal mandates to protect the Medicare Trust Fund while facilitating timely reimbursement for providers and beneficiaries.

25. The process for crossover claims is as follows:

    a. **How the Medicare Claim Crossover Process Works Seamlessly:** The crossover process automates the transfer of Medicare-processed claims to secondary payers, minimizing administrative burden on providers. It operates through electronic data interchange (EDI) systems and is facilitated by CMS's Coordination of Benefits Agreement (COBA) program, established under Section 1862(b) of the Social Security Act (42 U.S.C. § 1395y(b)). Here's a step-by-step breakdown:

Document ID: 664f3e4a7a8b9b8d6ad969dd22a544e064c43acd0adb2e299398bd9614ef3c00

b. **Claim Submission to Medicare:** Providers submit claims to their Medicare Administrative Contractor (MAC) using standard formats like the CMS-1500 or electronic 837P/837I. The claim must include indicators of secondary coverage, such as the beneficiary's other insurance details (e.g., Medigap policy number or employer-sponsored plan). Medicare processes the claim as primary payer if no other primary coverage exists, determining allowable amounts based on fee schedules and deductibles.

c. **Medicare Adjudication:** Upon approval, Medicare pays its portion (typically 80% of the approved amount after deductible). The MAC generates an Electronic Remittance Advice (ERA, 835 format) or paper remittance, which includes details like the Medicare payment, beneficiary responsibility, and any adjustments. If secondary coverage is indicated in CMS's Common Working File (CWF), the system flags the claim for crossover.

d. **Automatic Crossover Transmission:** Through COBA, CMS electronically forwards the adjudicated claim data to the secondary payer (e.g., Medigap insurers, Medicaid, or employer plans) via secure EDI gateways. This happens automatically, typically within 1–3 business days of Medicare processing, without provider intervention. The secondary payer receives a "crossover claim" file containing Medicare's payment details, allowing them to calculate their liability (e.g., covering the 20% coinsurance).

e. **Secondary Payer Processing and Payment:** The secondary payer reviews the crossover claim against their policy terms and issues payment directly to the provider or beneficiary. Providers receive a secondary remittance advice, closing the loop. If no COBA agreement exists, providers may need to submit manually, but most major secondary payers participate.

   i. This seamless integration reduces paperwork, minimizes errors, and accelerates reimbursements, typically completing within 14–30 days from initial submission.

f. **Why the Process is Compliant:** The crossover process is explicitly authorized and mandated by federal law to ensure efficient COB and prevent overpayments:

Document ID: 664f3e4a7a8b9b8d6ad969dd22a544e064c43acd0adb2e299398bd9614ef3c00

    g. **Statutory Foundation:** Under MSP rules (42 U.S.C. § 1395y(b)), Medicare acts as secondary payer when other insurance is primary (e.g., employer plans for working aged, auto insurance for accidents). The law requires CMS to coordinate with secondary payers to recover improper payments and automate claim sharing, as implemented in 42 C.F.R. § 411.20 et seq. COBA agreements are voluntary but legally binding contracts between CMS and secondary payers, compliant with HIPAA privacy rules (45 C.F.R. § 164.502(e)) for sharing protected health information in payment activities.

    h. **Why the Process is Appropriate:** Beyond compliance aspect, the crossover process is appropriate for policy and practical reasons:

    i. **Efficiency and Cost Savings:** It streamlines billing, reducing administrative burdens on providers and errors, aligning with CMS's goals under the Paperwork Reduction Act (44 U.S.C. § 3501 et seq.). Providers avoid dual submissions, and secondary payers receive accurate Medicare adjustments automatically.

    j. **Beneficiary Protection:** Ensures beneficiaries receive full benefits without gaps, supporting ACA non-discrimination provisions (42 U.S.C. § 18116) by facilitating access to care.

    k. **Program Integrity:** Prevents overpayments and fraud by automating COB, as required by MSP to protect federal funds. Non-participation by secondary payers could lead to beneficiary liability, undermining Medicare's protective intent.

## VII. CPT 58558 Does Not Have a Time Component; Nor Do Many Procedural Based CPT Codes.

26. While some CPT codes have a time component, there is no time component to CPT 58558. CMS does not have established nor do they publish "typical" durations for hysteroscopy procedures. Payments are not contingent on operative time but on the assigned Current Procedural Terminology (CPT) code. This aligns with CMS's focus on medical necessity and proper coding rather than procedural efficiency, per the NCCI Policy Manual (effective 2025), which emphasizes bundled payments over time-based billing.

10

Document ID: 664f3e4a7a8b9b8d6ad969dd22a544e064c43acd0adb2e299398bd9614ef3c00

27. Conflating "typical times" with Evaluation and Management Services (i.e., 99202 – 99215) is wrong. Medicare's own guidelines tells them how services are to be calculated for level of service. Time is an ancillary factor and does not control the overall level of service as you will see specifically stated in the Medicare Program Integrity Manual (MPIM), Section 30.6.1 - Selection of Level of Evaluation and Management Service (Rev. 11288; Issued: 03-04-22; Effective: 01-01-22; Implementation: 02-15-22) which states that ***"Medical Necessity – Medical necessity of a service is the overarching criterion for payment in addition to the individual requirements of a CPT code."***

28. The following guidance that is, as outlined above, is critical in this case: "B. Selection of Level of Evaluation and Management Service – Instruct physicians to select the code for the service based upon the content of the service. ***The duration of the visit is an ancillary factor and does not control the level of the service to be billed unless more than 50 percent of the face-to-face time (for non-inpatient services) or more than 50 percent of the floor time (for inpatient services) is spent providing counseling or coordination of care as described in subsection C."*** (emphasis added).

29. Section C of Chapter 12. "Selection of Level of Evaluation and Management Service Based On Duration of Coordination of Care and/or Counseling" provides further guidance on this issue: "Advise physicians that when counseling and/or coordination of care dominates (more than 50 percent) the face-to-face physician/patient encounter or the floor time (in the case of inpatient services), time is the key or controlling factor in selecting the level of service. In general, to bill an E/M code, the physician must complete at least 2 out of 3 criteria applicable to the type/level of service provided. However, the physician may document time spent with the patient in conjunction with the medical decision-making

11

involved and a description of the coordination of care or counseling provided. Documentation must be in sufficient detail to support the claim."

## VIII. Medicare and Medicaid Routinely Perform Pre-Payment Reviews.

30. CMS uses historical data to target specific CPT codes to review and audit. Medicare and Medicaid routinely perform pre-payment reviews (e.g., via Recovery Audit Contractors under 42 U.S.C. § 1395ddd) and post-payment audits for procedures like hysteroscopy, flagging them based on what Medicare considers unusually high volumes, lack of medical necessity documented, or "medically unbelievable" patterns exceeding MUEs (e.g., >1 unit/day for CPT 58558).

31. In 2025, targeted reviews focus on documentation for necessity, with denials for non-compliance (CMS Claims Processing Manual, Ch. 13). As part of these pre- and post-payment reviews, Medicare and Medicaid will request medical records from the Provider. These reviews and audits are a way for CMS to ensure the claims for the specific CPT codes are supported by the documentation and were, in fact, medically necessary. CMS then makes payment determinations based on the documentation.

## IX. Data Analytics Such as Identifying "Outliers" and the use of "Heat Maps" are Inherently Flawed.

32. CMS employs data analytics, including identifying "outliers" in billing data, the use of "heat maps," and Medically Unlikely Edits (MUEs) for "medically unbelievable days" (e.g., billing volumes exceeding realistic daily capacities) to identify alleged aberrant billing patterns.

33. When determining "outliers" CMS runs data to determine who is the highest paid provider for a certain code. This typically fails to account for differences in geography, specialization, or even patient base. For example, a provider who sees almost exclusively

12

Document ID: 664f3e4a7a8b9b8d6ad969dd22a544e064c43acd0adb2e299398bd9614ef3c00

Medicare and Medicaid patients maybe higher on the list than a provider who primarily sees private pay patients, making the identification of an "outlier" irrelevant. Likewise, a provider who specializes in an area, such as gynecologic oncology, will clearly be seeing a different patient base than a regular OB/GYN. Another area that is critical but often ignored by government experts is the use of ancillary or auxiliary personnel to perform incidental, yet integral portions of various services. This is known as "Incident-to" billing provisions and is outlined in the Medicare Benefit Policy Manual in Chapter 15 Section 60.1. By ignoring the possibility of incident-to the government often overstates or misrepresents outlier status.

34. As discussed above, many CPT codes that are procedural based are billed based on medical necessity, not time. Therefore, there is no way to know the exact time spent conducting a specific procedure. Generating a time and assigning it to a code is inherently flawed because it is nothing more than a fabrication. Using those fabricated times to then create what could be an "impossible day" by creating "heat maps" is likewise flawed.

35. Heat maps visualize geographic or provider-specific spikes. What is alarming in the case is that times can be generated, but where those times came from is anyone's guess since there are no typical times for these diagnostic services. The argument of medically unbelievable days is one that often fails due to overstating or misrepresentation that time drives the intensity of the services performed.

36. Using "typical times" for services such as Evaluation and Management (E/M) Services rather than focusing on what actually drives (Medical Decision Making / Total Time of the encounter) the various levels of services from 2021 forward is another significant flaw. Failing to consider or take into account that services could be rendered by

Document ID: 664f3e4a7a8b9b8d6ad969dd22a544e064c43acd0adb2e299398bd9614ef3c00

ancillary/auxiliary staff under the "Incident-to" Billing provisions can also lead to the provider having higher patient volumes, in addition to other explanations such as variation in patient population, which inflates total minutes/hours in a day for a provider if they are not accounted for.

I _____ , have reviewed the foregoing disclosure regarding my opinions, qualifications, and prior testimony, and it is true and accurate.

Signer ID: MKH51UOO16...

Respectfully submitted,

s/ Maritsa Flaherty
Maritsa Flaherty (*pro hac vice*) (Cal. Bar No. 327638)
CHAPMAN LAW GROUP
1441 W. Long Lake Rd., Suite 310
Troy, Michigan 48098
(248) 644-6323
mflaherty@chapmanlawgroup.com

Ronald Chapman, II (*pro hac vice*) (Mich. Bar No. P73179)
THE CHAPMAN FIRM
1300 Broadway
Detroit, MI 48226
Phone: (346) Chapman
Ron@chapmanandassociates.com

Lawrence J. Laurenzi (TN BPR No. 9529)
Elena R. Mosby (TN BPR No. 40562)
BURCH, PORTER & JOHNSON, PLLC
130 North Court Avenue
Memphis, TN 38103
901-524-5000
llaurenzi@bpjlaw.com
emosby@bpjlaw.com
*Attorneys for Dr. Sanjeev Kumar*

14

Document ID: 664f3e4a7a8b9b8d6ad969dd22a544e064c43acd0adb2e299398bd9614ef3c00