IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
WESTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | | |
|       Plaintiff, | | |
| v. | | Cr. No. 2:25cr20032-JTF |
| SANJEEV KUMAR, | | |
|       Defendant. | | |

**SANJEEV KUMAR, M.D.'S RULE 16 EXPERT WITNESS DISCLOSURE**

Defendant, Sanjeev Kumar, by and through his counsel, gives notice pursuant to Federal Rules of Criminal Procedure 16(b)(1)(C) of his intent to introduce the testimony of Jordan Johnson and/or Ryan Vaughn as an expert witness in this matter.

Jordan Johnson and Ryan Vaughn are both independent contractors for Safe Harbor, a healthcare compliance firm. Both Mr. Johnson and Mr. Vaughn are both independent contractors for Safe Harbor, a healthcare compliance firm. Both serve as data analysts and have been working with financial data and statistics for over a decade. With more than 12 years of experience analyzing CPT and CMS data, they have modeled the impacts of RVU changes using CMS Addendum B files from both Proposed and Final Rules, and identified patterns and trends from data exported from some of the nation's largest health systems' electronic medical records, encompassing both hospital and professional medical claims.

Mr. Johnson is also a clinician and former healthcare administrator, providing him with a deep understanding of the clinical and operational context behind the procedures represented by CPT codes. The collective work of Mr. Johnson and Mr. Vaughn spans independent freestanding

1

Document ID: 6d0b98ac8c641496e06312447135c2992f8cdc3949304ee029cb35f432976ce0

practices, academic medical centers, and large multisite hospital networks, bringing a unique blend of technical precision and applied healthcare expertise to Safe Harbor's analytical initiatives.

Jordan Johnson is one of the nation's leading consultants in billing, coding, and compliance within Healthcare and specifically the oncology sector. He is the founder of Bridge Oncology, where he leads initiatives that integrate financial sustainability, regulatory compliance, and clinical operations. Mr. Johnson's extensive data modeling and financial analytics have been utilized in the development of national value-based care frameworks and capitated payment models. A clinician and former administrator, he brings a unique understanding of both the clinical and operational dimensions of healthcare delivery. Mr. Johnson holds a Master of Legal Studies from Texas A&M University School of Law and continues to advise health systems, payers, and policymakers on strategies that promote compliance, transparency, and equitable access to oncology care.

Ryan Vaughn is a nationally recognized healthcare data and analytics expert specializing in federal fraud litigation exceeding $1.5 billion in claims. He has served as lead analytics expert in federal cases, including: *United States v. Bothra* (E.D.M.I. 2:18-cr-20800) and *United States v. Dr. Neil Anand* (E.D.P.A. 2:19-cr-00518). His Power BI and Excel models uncover coding anomalies, benchmark physician time, and reconstruct billing logic across millions of medical records.

As founder of DataBoards.io, Ryan delivers advanced Power BI dashboards and profitability models for over 100 clients. He holds an MBA from the University of Houston, graduating #1 in analytics, and was named by Dr. Wayne Winston as "the best student I've had in over forty years."

Mr. Johnson's and Mr. Vaughn's data analysis is based on the information provided to them.

Document ID: 6d0b98ac8c641496e06312447135c2992f8cdc3949304ee029cb35f432976ce0

Both Mr. Johnson's and Mr. Vaughn's curriculum vitae and data analysis have been produced with Defendant's discovery production to the Government. This report does not include a complete recitation of either Mr. Johnson's or Mr. Vaughn's testimony, and either one may offer additional testimony or opinions during trial. Additionally, both Mr. Johnson and Mr. Vaughn reserve the right to supplement their reports as necessary if further information becomes known to them or based on the additional data analysis the Government intends on producing. Any additional opinions will be disclosed no later than 28 days before trial, pursuant to Local Rule 16.1(c)(2).

Mr. Johnson and/or Mr. Vaughn will provide testimony regarding the following topics:

1. They analyzed Medicare and Medicaid claims data for Poplar Avenue Clinic provided by the Government.

2. In reviewing the Medicare data, 83% of claims were paid, which 17% were rejected or denied.

3. In reviewing the Medicaid data, 70% of claims were paid, while 30% were denied.

4. According to the data provided, the age of patients varied from 0 to 101.

5. In the Medicare data, 1,793 patients out of 2,210 never received a hysteroscopy/biopsy (CPT Code 58558) while a patient at Poplar Avenue Clinic. Only 192 patients out of 2,210 Medicare patients received one hysteroscopy/biopsy. This equates to 81.1% of Poplar Avenue Clinic patients never receiving a hysteroscopy/biopsy, and 8.7% receiving only one. The percentage of patients who received more than one hysteroscopy/biopsy was 10.2 %. During the relevant years, the total number of patients who received more than one hysteroscopy per year was anywhere from 30 patients (2019) to 133 patients (2022), but never higher.

6. Also in the Medicare data, only 17% (371 patients) received a hysteroscopy on their first visit, while 83% did not. Within two weeks of their first visit 18% of patients (387) received a hysteroscopy, while 82% did not.

7. In reviewing the Superseding Indictment, the government alleged that every patient received the same four services, which included a hysteroscopy with biopsy, abdominal ultrasound, transvaginal ultrasound, and a pap smear. Based on a review of the Medicare data for the following five codes, which included a pelvic ultrasound, there were zero instances in which a Poplar Avenue Clinic patient received all five procedures.

    a. **58558** – *Hysteroscopy, surgical; with sampling (biopsy) of endometrium and/or polypectomy, with or without D & C.*
    b. **76700** – *Ultrasound, abdominal, real-time with image documentation; complete.*
    c. **76830** – *Ultrasound, transvaginal.*
    d. **Q0091** – *Screening Papanicolaou smear; obtaining, preparing and conveyance of cervical or vaginal smear to laboratory.*
    e. **76856** – *Ultrasound, pelvic (nonobstetric), real-time with image documentation; complete.*

8. Based on a review of the Medicare data for the following four codes (58558; 76830; Q0091; and 76856), including the pelvic ultrasound, but leaving out the abdominal ultrasound, only 11% of Poplar Avenue Clinic patients received these four procedures on the first visit. Only 4% of the patients received all four procedures on any visit. Only 14% of the patients received all four procedures at any point in any combination of dates of service, i.e. not on the same day.

9. The Medicare data showed there were 1,764 unique code combinations. 70% of the code combinations were unique.

10. Mr. Johnson and Mr. Vaughn were asked to review six specific patients for six specific dates of service, which were provided to the government in which there is no data in either the Medicare database or Medicaid database to show the procedures were billed.

11. In the Medicaid data, 3,863 patients out of 8,976 never received a hysteroscopy/biopsy (CPT Code 58558) while a patient at Poplar Avenue Clinic. While 1,883 patients out of 8,976 Medicaid patients received one hysteroscopy/biopsy, this equates to 43% of Poplar Avenue Clinic Medicaid patients never receiving a hysteroscopy/biopsy, and 21% receiving only one. 12.4% of Medicaid patients received two hysteroscopies/biopsies. The percentage of patients who received more than two hysteroscopies/biopsies was 23.6%. During the relevant years, the total number of Medicaid patients who received more than one hysteroscopy per year was anywhere from 56 patients (2019) to 1,233 patients (2022), but never higher. This was out of a total of 8,976 Medicaid patients.

12. Also in the Medicaid data, 49% (4,409 patients) received a hysteroscopy on their first visit, while 51% did not. Within two weeks of their first visit 51% of patients (4,557) received a hysteroscopy, while 49% did not.

13. Based on a review of the Medicaid data for the following five codes, which included a pelvic ultrasound, there was one instance out of 46,008 unique patient visits in which a Poplar Avenue Clinic patient received all five procedures.

    a. **58558** – *Hysteroscopy, surgical; with sampling (biopsy) of endometrium and/or polypectomy, with or without D & C.*
    b. **76700** – *Ultrasound, abdominal, real-time with image documentation; complete.*
    c. **76830** – *Ultrasound, transvaginal.*
    d. **Q0091** – *Screening Papanicolaou smear; obtaining, preparing and conveyance of cervical or vaginal smear to laboratory.*

  e. **76856** – *Ultrasound, pelvic (nonobstetric), real-time with image documentation; complete.*

14. Based on a review of the Medicaid data for the following four codes (58558; 76830; Q0091; and 76856), including the pelvic ultrasound, but leaving out the abdominal ultrasound, only 9% of Poplar Avenue Clinic patients received these four procedures on any visit. 46% of the Medicaid patients received all four procedures at any point in any combination of dates of service, i.e. not on the same day, while the majority of Medicaid patients (54%) did not ever receive those four procedures.

15. The Medicaid data showed there were 6,567 unique code combinations, which equate to 67% of the overall visits. In other words, 67% of the time a Medicaid patient came to Poplar Avenue Clinic they received a unique set of procedures that was not the same as another patient.

16. Mr. Johnson and Mr. Vaughn reviewed the government's heat maps. They determined that there were times associated with CPT codes that do not inherently have a set time. They were unable to determine where these times came from.

17. 102 of the CPT Codes were assigned a time longer than 60 minutes. Some CPT codes, such as 58954, the government assigned a time of 320 minutes. CPT 57425 was assigned a time of 240 minutes. Both CPT 58954 and CPT 57425 are surgical codes.

18. The heat maps did not account for the fact that 91.4% of the time there was more than one provider working at Poplar Avenue Clinic. Nor did they account for the fact that 64% of the CPT codes could be performed by a Nurse Practitioner.

19. The formula that the government used was trying to sum on non-blanks cells but their formula did not account for hidden characters in blank cells. This is commonly classified as a ASCII character 32. The importance of accounting for character 32

cannot be overstated when analyzing datasets or formulas that rely on blank-cell logic. In this case, the government's formula attempted to count only non-blank cells, but it failed to recognize that some cells contained a hidden character 32—a non-printing space character. While these cells appear blank to the naked eye, Excel and other analytical tools interpret them as containing data. This error can significantly distort results, leading to overcounting or misclassification of supposedly "blank" entries. In data-driven analyses—particularly in high-stakes audits or legal contexts—overlooking character 32 introduces false positives and undermines the validity of statistical findings. Proper data cleaning and character recognition are essential to ensure analytical integrity and prevent misleading conclusions.

20. The E&M codes make up 36% of the Total Time in the government's heat map.

21. Mr. Johnson and Mr. Vaughn reviewed the Medicare and Medicaid claims for the patients and dates of service listed in the Superseding Indictment. In doing so, they identified which patients had crossover claims, or claims which were submitted to both Medicare and Medicaid (as secondary insurance).

22. Finally, Mr. Johnson and Mr. Vaughn compared Dr. Sanjeev Kumar's billing data for all insurers with other Obstetrics/Gynecologists in Tennessee for the years of 2020 to 2023. In 2020, in Tennessee there were 26 other providers who billed more to insurance programs than Dr. Kumar, with the number one provider billing $531,364 while Dr. Kumar only billed $98,085. In 2021, Dr. Kumar was second but billed less than half of what the number one provider billed. In 2023, there were 47 providers who billed more than Dr. Kumar with the top provider billing over one million dollars and Dr. Kumar billing $93,055.

Document ID: 6d0b98ac8c641496e06312447135c2992f8cdc3949304ee029cb35f432976ce0

I *Jordan Johnson*_____, have reviewed the foregoing disclosure
Signer ID: ROTEKHOT16...

regarding my opinions, qualifications, and prior testimony, and it is true and accurate.

I *Ryan Vaughn*_____, have reviewed the foregoing disclosure
Signer ID: VTA6ABXR16...

regarding my opinions, qualifications, and prior testimony, and it is true and accurate.

    Respectfully submitted,

    s/ Maritsa A. Flaherty
    Maritsa A. Flaherty (*pro hac vice*) (Cal. Bar No. 327638)
    CHAPMAN LAW GROUP
    1441 W. Long Lake Rd., Suite 310
    Troy, Michigan 48098
    (248) 644-6323
    mflaherty@chapmanlawgroup.com

    Ronald Chapman, II (*pro hac vice*) (Mich. Bar No. P73179)
    THE CHAPMAN FIRM
    1300 Broadway
    Detroit, MI 48226
    Phone: (346)Chapman
    Ron@chapmanandassociates.com

    Lawrence J. Laurenzi (TN BPR No. 9529)
    Elena R. Mosby (TN BPR No. 40562)
    BURCH, PORTER & JOHNSON, PLLC
    130 North Court Avenue
    Memphis, TN 38103
    901-524-5000
    llaurenzi@bpjlaw.com
    emosby@bpjlaw.com
    *Attorneys for Dr. Sanjeev Kumar*

Document ID: 6d0b98ac8c641496e06312447135c2992f8cdc3949304ee029cb35f432976ce0