IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
WESTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | |
| Plaintiff, | |
| v. | Cr. No. 2:25cr20032-SHL |
| SANJEEV KUMAR, | |
| Defendant. | |

**SANJEEV KUMAR, M.D.'S RULE 16 EXPERT WITNESS DISCLOSURE**

Defendant, Sanjeev Kumar, by and through his counsel, gives notice pursuant to Federal Rule of Criminal Procedure 16(b)(1)(C) of his intent to introduce the testimony of Christopher Palenik, Ph.D. as an expert witness in this matter.

Dr. Palenik holds a Ph.D. in Geology from the University of Michigan, where he also earned his M.S. He holds dual B.S. degrees in Chemistry and Geology from the University of Chicago. He is currently the Vice President and Senior Research Microscopist at Microtrace, a forensic laboratory specializing in microscopy, microchemistry, and microanalysis.

Prior to working at Microtrace, he served as a Post-Doctoral Fellow at the Federal Bureau of Investigation's Counterterrorism and Forensic Science Research Institute from 2004-2005. He is licensed by the Texas Forensic Science Commission in Materials (Trace) and holds DEA and ATF federal licenses to analyze controlled substance and explosives. Dr. Palenik has authorized dozens of peer-reviewed scientific papers, book chapters, NIJ-funded technical reports, and conference proceedings.

Dr. Palenik sits on multiple forensic science advisory committees, including OSAC Scientific Area Committee for Materials (Trace Evidence), North Carolina Forensic Advisory Board, ASTM

1

Document ID: 79d8e344d85bd3ff3ddaced86c4e69619e6786bb796cf9cef2468a427e07158a

E30 Criminalistics Subcommittee. He has been qualified and testified as an expert in state, federal, military, and international courts.

His curriculum vitae and expert report have been produced with Defendant's discovery production to the Government. Dr. Palenik recently viewed the evidence seized by the Government. While he has completed a substantial analysis of the items, he has not had adequate time to complete his review and analysis, and formalize all of his opinions. This disclosure does not include, therefore, a complete recitation of Dr. Palenik's testimony, and he may offer additional testimony or opinions during trial. Additionally, he reserves the right to supplement as necessary if further information becomes known to her. Any additional opinions will be disclosed no later than 28 days before trial, pursuant to Local Rule 16.1(c)(2).

Based on his review, training, experience, and expertise, Dr. Palenik will testify to the following:

**I.    Confiscated Samples**

1. The following samples were inspected and/or sampled over the course of two inspections, which occurred on September 15, 2025, at the Memphis U.S. Attorney's Office and over the period of September 23-24, 2025 at Microtrace (Elgin, IL) (Table 1).

Table 1. Summary of Samples Inspected

| FACTS# | LabID | Item Description (Plaintiff Provided) | Inspection 09/15/2025 | Inspection 09/23-24/25 |
|---|---|---|---|---|
| 1259234 | 01A | Endosee PX Cannula | Y | Y |
| 1259234 | 01B | Hystero-V Hysteroscope | Y | Y |
| 1259234 | 01C | Hystero-V Hysteroscope | Y | Y |
| 1259234 | 02A | CooperSurgical Disposable Alligator Grasper Forceps | Y | Y |
| 1259234 | 02B | Scissor handle with rod | Y | N |
| 1259234 | 02C | Scissor handle with black connector | Y | Y |
| 1259234 | 03A | Hystero-V Hysteroscope | Y | Y |
| 1259234 | 03B | Endosee PX cannula | Y | Y |

Document ID: 79d8e344d85bd3ff3ddaced86c4e69619e6786bb796cf9cef2468a427e07158a

| 1259234 | 04A | CooperSurgical Disposable Alligator Grasper Forceps | Y | Y |
| 1259234 | 04B | Scissor handle with rod | Y | N |
| 1259234 | 05A | Lina OperaScope | Y | Y |
| 1286249 | 01A | Hystero-V Hysteroscope | Y | Y |
| 1286249 | 01B | Lina Operascope Biopsy Forceps | Y | Y |
| 1286249 | 01C | Lina Operascope Biopsy Forceps | Y | N |
| 1286249 | 01D | CooperSurgical Disposable Alligator Grasper Forceps | Y | N |
| 1286249 | 01E | Scissor handle with rod | Y | N |
| 1286249 | 02A | Scissor handle with rod | Y | N |
| 1286249 | 02B | CooperSurgical Disposable Alligator Grasper Forceps | Y | Y |
| 1286249 | 03A | Scissor handle with black connector and grasper end | Y | N |
| 1286249 | 03B | Hystero-V Hysteroscope | Y | N |
| 1286249 | 03C | Hystero-V Hysteroscope | Y | N |
| 1286249 | 03D | Hystero-V Hysteroscope | Y | N |
| 1286249 | 04A | Hystero-V Hysteroscope | Y | Y |
| 1286249 | 05A | Scissor handle with black connector and grasper end | Y | Y |
| 1286249 | 06 | Empty cylindrical container | Y | Y |
| 1286249 | 06A | Hystero-V Hysteroscope | Y | N |
| 1286249 | 06B | Hystero-V Hysteroscope | Y | Y |
| 1262737 | 1 | Control sample HysteroViu | Y | N |
| 1262737 | 2 | Control sample Uro-V Cystoscope | Y | N |
| 1262737 | 3 | Control sample Uro-G Cystoscope | Y | N |

## II.   Materials From Dr. Kumar's Office

2. The following materials were collected by Dr. Kumar from his Memphis office, shipped to Microtrace via FedEx and received on September 18, 2025 (Table 2).

**Table 2. Summary of Exemplar Samples Received**

| MT-ID | Item Description (Plaintiff Provided) |
|---|---|
| Ex B | Uro-V Cytoscope Diagnostic Cannula, Lot 220831001, sealed |
| Ex C | Hystero-V Hysteroscope Diagnostic Cannula, Lot 230301001 |
| Ex D | Yellow cloths (3) |
| Ex E | Pink/Red cloths (3) |
| Ex F | Green cloth (1) |
| Ex G | Gauze (white) |
| Ex H | Pads (white) (2) |

3

| Ex I | Pad (blue/white) (1) |
|---|---|
| Ex J | Paper towel |
| Ex K | Pad (pink/white) (1) |
| Ex L | Paper (white) (2) |
| Ex M | Plastic container |

### III.  Exemplar CIDEX(SP) Solution

3. A sealed reference sample of "ASP CIDEX OPA" (Lot 519900030), shipped from Care Express products, was received on October 8, 2025.

### IV.  Dr. Palenik's Approach and Results

4. The following sections of this report address various observations and results reported by the FDA coupled with observations made during Dr. Palenik's evidence inspections and subsequent analyses.

   a. Functionality of Devices:

      i. No attempt was made to manipulate the devices to explore their functionality. However, during the inspection, physical issues were noted with several of the devices that would prevent or severely limit their functionality. These include separated devices (Figure 1)[1], bent and kinked devices (Figures 2-4), and devices with obscured lenses (Figure 5). The inspection images collected at Microtrace are consistent with the damaged captured during documentation by the FDA laboratory (see Figures 1-5).

   b. Body Fluids:

      i. The FDA discuss using 455 nm light to examine items "since body fluids commonly fluoresce at this wavelength" and cite an article by Mirand at al.

---

[1] All Figures can be found in Dr. Palenik's report, which was submitted to the Government in discovery.

4

Document ID: 79d8e344d85bd3ff3ddaced86c4e69619e6786bb796cf9cef2468a427e07158a

(2014). The Mirand article is on the topic of "the fluorescence of body fluids on different surfaces and times." This article studies various body fluids using 455 nm illumination "as suggested by the manufacturer" of the MegamaxxTM ALS system. A "suggestion" by a commercial manufacturer of a product used in a research study does not establish valid scientific support for the use of a particular wavelength of light to confirm the identity of body fluids on a sample of an unknown substance.

ii. That said, body fluids may fluoresce in blue/violet excitation (455 nm); however, the observation of fluorescence excited by 455 nm illumination is neither: (a) a specific test for body fluids or (b) a valid method to confirm the identity of body fluids. The actual identification of body fluids would need to be established through other, more specific testing. For example, specific tests exist for the detection of blood, saliva, urine, and other chemical tests exist that can specifically demonstrate the presence of certain molecular constituents that are indicative of specific body fluid.

iii. The FDA also notes that, "This wavelength [455 nm] was also chosen to eliminate the fluoresce of cleaners or detergents which typically do not fluoresce above 440 nm," citing an article by Horiba Scientific.[2] A review of this application note, which is an advertisement for their "Mini- CrimeScope Advance" product and not a peer-reviewed publication, states "Many of the

---

[2] Horiba Scientific "Detection of body fluids with an alternate light source." Applications, Horiba.com May 23, 2004.

Document ID: 79d8e344d85bd3ff3ddaced86c4e69619e6786bb796cf9cef2468a427e07158a

cleaning products will fluoresce just like a body fluid and may be visually indistinguishable from them."

iv. This article goes on further to state that, "To eliminate the fluorescence of the cleansers or detergents, use a Forensic Light Source tuned above 440 nm." Both the source of this statement (the manufacturer of a commercial product) and its absolute certainty ("to *eliminate* the fluorescence of the cleaners") raise doubt about its validity. As such, a short test was conducted to evaluate this statement in the context of this case. A sample of the cleaning solution from Dr. Kumar's office (Ex N) and a sample of the dried cleaning residue from the bottom of the samples were examined under a blue light source. Figure 6 shows that both the cleaning solution from Dr. Kumar's office (Ex N) (Figure 6A and B) and the dried cleaning residue in the bottom of the -249-6 (Figure 6B and C) exhibit fluorescence under blue light excitation. This is in direct contrast to the article cited by FDA in defense of their report statement: "This wavelength was also chosen to eliminate the fluorescence of cleaners or detergents which typically do not fluoresce above 440nm." This illustrates that the use of an excitation source >440 nm does not necessarily eliminate contribution of cleaning agents to observed fluorescence and that this approach does not provide a specific identification of body fluids.

v. Furthermore, a review of the discovery materials provided for review found that only a single sample was tested with a body-fluid-specific test. More specifically, three areas of sample -234- 04B were swabbed and tested for

6

Document ID: 79d8e344d85bd3ff3ddaced86c4e69619e6786bb796cf9cef2468a427e07158a

    blood by the FDA laboratory.[3] The result for the FDA conducted blood test was negative in each of the three tested locations of sample -234-04B.

  vi.  Therefore, based upon these results, no body fluids were identified in any of the samples collected from Dr. Kumar's office. Furthermore, the use of an ALS excitation wavelength greater than 440 nm does not provide a specific indication of body fluids since cleaning fluids related to this case also fluoresce under this excitation.

  c.  Liquid in the Devices

    i.  The FDA results for several samples note that "liquid is present in the tube" (e.g., samples -234- 1B, -1C, -3B).[4] An example of this is illustrated in the FDA results and reproduced in Figure 7A of this report. During our examination of the samples, a similar feature was consistently observed other devices with similar tubes (e.g., Figure 11B). In fact, a consistent feature was also observed in an exemplar sample that was sealed upon receipt at Microtrace (Ex N) (Figure 11C). Further examination of this feature shows that the flow lines and bubbles are fixed in place and do not move when the tube is rotated or tilted. These observations, coupled with the location of this apparent liquid (i.e., near junctions of the tube with other parts of the device), strongly suggests that this apparent liquid is actually a solid, and furthermore, that the apparent liquid substance is most likely a solidified (i.e., no longer a

---

[3] Bates USA-0083838-83845.
[4] FDA FCC Section Results Sheet (Bates USA-0083846).

Document ID: 79d8e344d85bd3ff3ddaced86c4e69619e6786bb796cf9cef2468a427e07158a

liquid) assembly glue that is unrelated to the history of the devices after they were removed from the manufacturer packaging.

- d. Unknown Substances
    - i. The FDA results for samples studied from sets -234[5] and -249[6] reference numerous unknown materials, debris, and fiber-like particles on the various samples studied. Save for the negative blood tests conducted on one sample (which did not identify a substance), no attempts were made to identify any of these substances.
    - ii. Each of these unknown materials could be identified through further analysis. Samples of these substances were collected during the inspection at Microtrace. Dr. Palenik has been unable to fully pursue the identifications of the unknown substances prior to the its submission as of the date of his filing; however, there are a few notable observations Dr. Palenik makes regarding the characteristics of these substances:
        1. *Items found together:* Several of the confiscated items were found in the same containers (Figure 8A) and packaged together in the same bags (Figure 8B). For both of these reasons, the unknown substances detected on each of these items could be intermingled amongst the items found and packaged together. Thus, a source of any given particle of residue may not necessarily be related to the device upon which is now found.

---

[5] Bates USA-0083846.
[6] Bates USA-0089865.

Document ID: 79d8e344d85bd3ff3ddaced86c4e69619e6786bb796cf9cef2468a427e07158a

2. *Fibrous particles:* Fibers were noted on numerous samples. Fibers represent one of the most common constituents of indoor dust samples and are considered (in lieu of more specific identification) to be ubiquitous. Fibers can arise from a wide range of sources including (but not limited to) paper products, clothing, carpets, coverings, and furnishings. Furthermore, fibers are readily transferred with individuals from location to location (*i.e.*, a basis tenant of trace evidence analysis). As such, without a more specific identification, there is no way to know when these fibers were introduced or from where they arose. That said, during an inspection of an exemplar device[7] from Dr. Kumar's laboratory that was provided to Microtrace in a factory sealed package (Ex N), one fiber was located on the tip of the lens. This fiber, as observed on an unused device, is shown in Figure 9A. The location of this fiber is consistent with at least one of the fibers located by the FDA during their inspection of the evidence (Figure 9B). This suggests some of the observed fibers may be inherent to that manufacturing process of the device.

3. *Apparent Cleaning Solution Residue:* Several of the devices contain a visually amorphous, granular, residue that fluoresces. The fluorescence and texture of this material is, at this level of analysis, broadly consistent with the dried cleaning solution in the containers.

---

[7] Uro-V Cytoscope Diagnostic Cannula (Lot 220831001).

Document ID: 79d8e344d85bd3ff3ddaced86c4e69619e6786bb796cf9cef2468a427e07158a

For example, compare the residue on the lens of sample -249-6B (Figure 5) to that collected from the container in which it was found (Sample- 249-6, Figure 6C). This could be explored further through additional analysis.

4. *Other Debris:* A wide range of other debris was noted by the FDA and observed during Dr. Palenik's inspections of the evidence. This includes deposits on metal, residues on plastic, and fine debris that varies in color. Detailed analysis to identify them could provide further context as to the source of such materials and their relationship (or lack thereof) this matter. For example, upon removing the Uro-V Cytoscope Diagnostic Cannula (Ex N) from its sealed packaging, an inspection by stereomicroscopy showed the presence of the previously discussed fiber (Figure 9b), as well as a fine debris on the tip end of the instrument (bracket in Figure 10). The FDA image of exemplar sample -737-2A also shows indications of fine particles on its surface (Figure 11).

**V.    Conclusion and Discussion**

5. Based upon Dr. Palenik's review of the materials and of evidence in the case, he makes the following conclusions, which are supported by scientific evidence put forth in the above report:

   a. Functionality: At least some of the items examined are not functional (based on obvious kinks or breaks in the items).

Document ID: 79d8e344d85bd3ff3ddaced86c4e69619e6786bb796cf9cef2468a427e07158a

    b. Device Usage: The FDA concluded that "using ALS and SLM, the unknown fiber-like particles, debris, and other markings observed on 1259234 Items 1B, 1C, and 3B were not observed on the sealed control 1262737 Items 1A and 2A. Therefore, 1259234 Items 1B, 1C, and 3B appear to have been used and are not consistent with the sealed control 1262737 Items 1A and 2A."[8]

        i. The use of the conditional term "appears" in the phrase "appears to have been used" logically implies that it is also possible that the devices were not used. This is not a definitive conclusion and raises questions as to the value of this statement.

    c. Source and History of the Particles: None of the substances observed on the items were identified and no body fluids were detected by the FDA. The use of blue light to imply that body fluids may be present is invalid due to the fluorescence of cleaning fluid known to have been used in the clinic environment. Furthermore, the lack of any definitive identification places limitations on the significance of these results. For instance, at least some of the observed particles on the device could have originated from the manufacturing process (based upon the presence of fibers and other debris on a factory sealed exemplar). Ultimately, these limitations also limit the significance of FDA laboratory results in the context of case relevant questions. More specifically, the FDA laboratory results:

        i. Do not demonstrate if any of the devices are functional;

        ii. Do not demonstrate the identity or source of any of the substances observed on the devices;

---

[8] Bates USA-0083918.

11

Document ID: 79d8e344d85bd3ff3ddaced86c4e69619e6786bb796cf9cef2468a427e07158a

    iii. Do not demonstrate that any of the confiscated devices were ever used on a person; or

    iv. Do not demonstrate that any of the confiscated devices were used on more than one person.

6. Finally, Dr. Palenik's examination and analysis of the samples in this case remains ongoing, and he reserves the right to supplement or change this report with additional information. This report is based on information provided to him as well as observations and analyses that he has conducted. This does not include a complete recitation of his testimony and he may offer additional testimony or opinions during trial. He reserves the right to supplement this report, as necessary, if additional information becomes known to him.

I *Christopher S. Palenik* have reviewed the foregoing disclosure regarding my opinions, qualifications, and prior testimony, and it is true and accurate.

Signer ID: BG6I4EOH16...

    Respectfully submitted,

    s/ Maritsa A. Flaherty
    Maritsa A. Flaherty (*pro hac vice*) (Cal. Bar No. 327638)
    CHAPMAN LAW GROUP
    1441 W. Long Lake Rd., Suite 310
    Troy, Michigan 48098
    (248) 644-6323
    mflaherty@chapmanlawgroup.com

    Ronald Chapman, II (*pro hac*) (Mich. Bar No. P73179)
    THE CHAPMAN FIRM
    1300 Broadway
    Detroit, MI 48226
    Phone: (346) Chapman
    Ron@chapmanandassociates.com

Document ID: 79d8e344d85bd3ff3ddaced86c4e69619e6786bb796cf9cef2468a427e07158a

>Lawrence J. Laurenzi (TN BPR No. 9529)
>Elena R. Mosby (TN BPR No. 40562)
>BURCH, PORTER & JOHNSON, PLLC
>130 North Court Avenue
>Memphis, TN 38103
>901-524-5000
>llaurenzi@bpjlaw.com
>emosby@bpjlaw.com
>*Attorneys for Dr. Sanjeev Kumar*

Document ID: 79d8e344d85bd3ff3ddaced86c4e69619e6786bb796cf9cef2468a427e07158a

14

Document ID: 79d8e344d85bd3ff3ddaced86c4e69619e6786bb796cf9cef2468a427e07158a