**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
WESTERN DIVISION**

**UNITED STATES OF AMERICA,**

        **Plaintiff,**

**VS.**                              **Criminal No. 25-cr-20032-SHL**

**SANJEEV KUMAR,**

        **Defendant.**

---

**UNITED STATES' RESPONSE IN OPPOSITION TO DEFENDANT'S
CONSOLIDATED MOTION FOR JUDGMENT OF ACQUITTAL AND MOTION FOR
NEW TRIAL**

---

The United States of America opposes defendant's Consolidated Motion for Judgement of Acquittal and Motion for New Trial. RE-287. The request for a *Remmer* hearing is premature. Defendant's additional arguments are without merit. The motion should be denied on all grounds.

**LAW AND ARGUMENT**

In a defendant's challenge to the sufficiency of the evidence under Federal Rule of Criminal Procedure Rule 29, this Court reviews the evidence in the light most favorable to the government to determine whether any rational trier of fact could have found the essential elements of each count of conviction beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 313 (1979); *United States v. Avery*, 128 F.3d 966, 971 (6th Cir. 1997). "[A] defendant claiming insufficiency of the evidence bears a very heavy burden." *United States v. Abboud*, 438 F.3d 554, 589 (6th Cir. 2006) (citation and internal quotation marks omitted). This is because "[t]he government is given 'the benefit of all reasonable inferences' drawn from the evidence, and courts must 'refrain from independently judging the weight of the evidence.'" *United States v. Fekete*, 535 F.3d 471, 476

1

(6th Cir. 2008) (quoting *United States v. Suarez*, 263 F.3d 468, 476 (6th Cir. 2001)).

Federal Rule of Criminal Procedure Rule 33 permits this Court to grant a new trial where "the verdict was against the manifest weight of the evidence." *United States v. Crumb*, 187 Fed.Appx. 532, 536 (6th Cir. 2006). "A district judge, in considering the weight of the evidence for purposes of adjudicating a motion for new trial, acts as a thirteenth juror, assessing the credibility of witnesses and the weight of the evidence." *United States v. Hughes*, 505 F.3d 578, 593 (6th Cir. 2007). A Rule 33(a) motion should be granted "only in the extraordinary circumstance where the evidence preponderates *heavily* against the verdict." *United States v. Freeman-Payne*, 626 Fed.Appx. 579, 584-85 (6th Cir. 2015). Rule 33(a) motions are "granted only with great caution." *United States v. Garner*, 529 F.2d 962, 969 (6th Cir. 1976).

Kumar does not specify in his motion which grounds should be remedied by which rule. However, regardless of the standard applied, Kumar's claims fail and his motion should be denied.

## I.    Kumar has not yet presented a "colorable claim" to require *Remmer* hearing.

Firstly, Kumar claims that the Government's pretrial statements require a new trial. This Court appropriately denied defendant's motion for a change of venue because the pretrial publicity did not "create a presumption of bias." Order Denying Defendant Motion to Change Venue, RE-107, PageID 912. Kumar claims that nearly every member of the venire "appeared" aware of the press but provides no evidence in the record to support this. Def. Mot. for New Tr., RE-287, PageID 7249. The questionnaires revealed that most of the venire had no prior knowledge of the defendant, his practice, or his case. Some prospective jurors expressed distress about serving, but none related it to the media coverage of the case. Kumar suggests that this Court erred in not permitting defense counsel to explore feelings individually but cites nothing to support this claim. To the extent any remedy is sought, it should be denied.

2

Kumar next claims that the information he presented in his sealed motion requires a *Remmer* hearing. *Id*. As a threshold matter, a defendant must present a "'colorable claim' that extraneous information or contact had an obvious or likely adverse effect on the jury" to require a *Remmer* hearing. *In re Sittenfeld*, 49 F.4th 1061, 1066 (6th Cir. 2022). Most of the cases cited by defense involved "colorable claims" made directly by the individual receiving the information at issue. In fact, only one of the cases originated with the defense team in a manner analogous to the one described in their sealed motion. In *United States v. Daniels*, defendant Orlando filed a motion that said he had a phone conversation with a juror that was initiated by that juror. 111 F.Supp. 2d 993, 995 (M.D. Tenn. 2000). The motion detailed that "the verdict as to Orlando 'may not have been unanimous; may not have been decided based on the evidence that was presented in the courtroom; and may have been influenced by newspaper publicity.'" *Id*. The district court held a hearing within a week of receiving the motion whereby it received evidence of these phone calls, including testimony from defendant Orlando and his handwritten notes, before scheduling a *Remmer* hearing to consider testimony from the juror. *Id*. Notably, defendant Orlando filed his motion within days of the guilty verdict, which necessarily meant within days of receiving the phone call alleged. *Id*. at 994-95.

In this case, based on his representation, more than two weeks passed after receiving a phone call before defense counsel Ronald Chapman alerted this Court. Def. Sealed Mtn. for Evid. Hrg. RE-288. Mr. Chapman claims to have received a phone call initiated by Juror X and, without requesting approval to interrogate this juror pursuant to Local Role 47.1(e), called Juror X back, speaking with the juror for approximately one hour. *Id*. Mr. Chapman makes no allegations that Juror X told him that any information he may have received had an adverse effect on Juror X or anyone else. *Id*. Kumar baldly claims that if information were received related to the two claims

3

in his motion, it could have influenced juror perception. *Id*. The United States suggests that the proceedings in *Daniels* guide this Court and that a record, with testimony and evidence introduced by Mr. Chapman, is the appropriate course of action given the lack of a "colorable claim" at the present time. 111 F.Supp. 2d 993, 995 (M.D. Tenn. 2000).

In the other cases cited by defense, the allegation of extraneous information reaching the jury came from in-trial juror notes, juror alerts to the marshal or judge, facially provable instances, a report to defense counsel who immediately alerted all parties, or post-trial affidavits by jurors. In *Remmer v. United States*, the juror who was approached by an unnamed person reported the incident directly to the judge. 347 U.S. 227, 228 (1954). In *Smith v. Phillips*, a sitting juror had applied for a position at the prosecutor's office during the trial, which was evidenced by the juror's submitted application. 455 U.S. 209, 212 (1982). In *United States v. Baskerville*, jurors who questioned whether they were experiencing incidents of intimidation reported the conduct to this Court by way of a juror note. 164 F.4th 459, 469 (6th Cir. 2026). In *United States v. Rigsby*, a juror informed a marshal that she may know some of the witnesses after the prosecutor mentioned them by name in her opening statement and inquired whether that would be a problem. 45 F.3d 120, 122 (6th Cir. 1995).

In *United States v. Davis*, a juror sent a note to the judge after the trial, but before instruction, requesting his excusal because an employee had told him that people in his small community were already aware of his jury service and he had safety concerns about his role as a juror. 117 F.3d 552, 556 (6th Cir. 1999). The judge did not act on the note immediately and after jury instructions, the juror stood up and expressed his concerns in open court, in front of the other jurors. *Id*. In *United States v. Herndon*, the jury foreman sent a note to the judge regarding a potential extraneous influence on juror #1. 156 F.3d 629, 632 (6th Cir. 1998). In *United States v.*

4

*Corrado*, an individual approached the defendant two days before closing arguments were scheduled and told him that he had a friend in the jury and could assist in jury tampering. 227 F.3d 528, 533 (6th Cir. 2000). The defendant, through his defense counsel, immediately reported the incident to the government and court. *Id*. In *Ewing v. Horton*, a juror filed an affidavit stating two fellow jurors introduced information during the trial. 914 F.3d 1027, 1029 (6th Cir. 2019).

What is missing here is sufficient information to understand what the claim is. The United States is unable to interpret the information provided by Mr. Chapman to determine what information was received by the jurors, when, and how it may have impacted them. Additionally, even if the alleged extraneous information was received, the fact that the jurors were not unanimous on several counts suggests a lack of influence on their verdicts. However, if there is a "colorable claim" presented through testimony and evidence of Mr. Chapman, then the United States agrees it is appropriate to proceed to a *Remmer* hearing.

## II.    Proof at trial of adulteration and misbranding adequately supported guilty verdicts.

Kumar claims the government failed to prove that Counts 1 through 36[1] occurred on or about the date charged in the Indictment. Def. Mot. for New Tr., RE-287, PageID 7249. As support, he states that "no witness testified that they used the specific devices charged in Counts 1 through 36 on April 16, 2024, let alone on a date 'reasonably near' in time." *Id*. at 7250.

The Court's jury instructions correctly set out the elements for adulteration, which applied to Counts 1 through 16 and 33 through 36 as the following: "[f]irst: [t]hat the defendant received the device identified in the indictment after shipment in interstate commerce; [s]econd: [t]hat the defendant held for sale the device; and [t]hird: [w]hile holding the device for sale, the defendant

---

[1] Kumar is certainly aware that no verdicts were returned for Counts 34 and 36, so the government responds assuming he refers generally to the adulteration and misbranding charges in the Indictment for which guilty verdicts were returned.

*did an act or caused an act to be done with respect to the device that resulted in the device being adulterated*." Jury Instructions, RE-261, PageID 6975, 6980 (emphasis added). For the misbranding charges at Counts 17 through 32, only the third element was distinct from the adulteration elements: "[w]hile holding the device for sale, the defendant *did an act or caused an act to be done with respect to the device that resulted in the device being misbranded*." *Id*. at 6978 (emphasis added). The Court explained that "[a] device is adulterated if it is held under insanitary conditions whereby there is a reasonable possibility it may have been contaminated with filth, or whereby it may have been rendered injurious to health. The term 'insanitary conditions' and 'filth' should be given their usual and ordinary meanings." *Id*. at 6976. Kumar has no issue with an additional element addressing intent to defraud or mislead. *Id*. at 6976.

Kumar demands evidence that the charged medical devices were *used* on or about the April 16, 2024. Def. Mot. for New Tr., RE-287, PageID 7250. But use of a medical device is not an element of either adulteration or misbranding. There is no requirement under the law to prove that anyone used the device on the dates charged. In a similar vein, Kumar contends that the evidence did not support the conclusion that "a specific act of adulteration or misbranding occur[ed] on or about April 16, 2024." *Id*. at 7251. Kumar's argument assumes holding a medical device in insanitary conditions does not constitute an adulterative act, but this issue was already addressed by the Court during motion practice and therefore fails to comport with the law-of-the-case doctrine. *See Schenck v. City of Hudson*, 2000 WL 245482, *1 (6th Cir. 2000) (quoting *United States v. Todd*, 920 F.2d 399, 403 (6th Cir. 1990)) ("In general, the law-of-the-case doctrine states that 'a decision on an issue made by a court at one stage of a case should be given effect in successive stages of the same litigation.'").

During motion practice, Kumar moved to dismiss the Indictment on a theory of failure to

state an offense, claiming that the Indictment "does not specify the act, date, or patient where the alleged act of 'adulteration' or 'misbranding' occurred." Mot. to Dismiss, RE-159, PageID 1481. And secondly, concerning Counts 1-16, that the government had failed to charge a viable adulterative act because the true "act" should have been not holding the devices in insanitary conditions but the actual "procedure[s] in which the device[s] w[ere] 'reused,'" which he argued the government did not allege with specificity. *Id*. at Page ID 1482. In denying the motion, the Court found that the "holding or storing itself was the violative act" because "the Indictment alleges that Kumar held re-used single use devices for sale under insanitary conditions on April 16, 2024." Order Denying Motions to Dismiss, RE-194, PageID 1803. Under the law-of-the-case doctrine, the holding of the devices under insanitary conditions is the adulterative act. Kumar cannot make the legal claim now that some further adulterative act was required.

Because *use* is not an element of adulteration or misbranding, and because holding a device in insanitary conditions served as an adulterative act on or about April 16, 2024, Kumar's reliance on *United States v. Ford*, 872 F.2d 1231 (6th Cir. 1989) is consequently misplaced. Mot. to Dismiss, RE-159, PageID 7249-50. *Ford* dealt with illegal possession of a firearm on or about a certain day. The district court "instructed the jury that it could find possession on any date over a period of approximately eleven months." 872 F.2d at 1236. The Sixth Circuit held that the district court had constructively amended the indictment based on overly broad interpretation of "on or about." *Id*. at 1237. There, it was "possible that some jurors may have found that [the defendant] possessed a firearm on [any one of several dates for which there was evidence at trial of possession] all within the district judge's instruction" and it was "therefore uncertain whether the guilty verdict returned … was unanimous as required." *Id*. at 1236-37.

*Ford* is not analogous to this case. No instruction from the Court broadened the meaning

of "on or about" beyond the normal meaning. The trial record is replete with lay and expert testimony, photographs, and physical exhibits showing that the charged devices were held in insanitary conditions available for patient use on the day of the search warrant. The jury rejected the notion that those items were merely dirty dishes or trash soaking in disinfectant prior to being disposed. The jury's verdict was entirely rational that the devices found on April 16, 2024 were in fact adulterated and misbranded on or about April 16, 2024 as alleged in the Indictment.

Kumar goes on to allege various impossibility arguments as it relates to the date in question. But he only selectively refers to the trial record in making his claim. The first device is the CooperSurgical Endosee PX Cannula. Def. Mot. for New Tr., RE-287, PageID 7251. Kumar claims "it would have been impossible to re-use the Endosee cannulas" because of the "kill switch function." *Id*. But in discussing the "kill switch," as defense termed it, Rowena Schimmel testified that a single cannula can be re-used any number of times when the device base is in "demo mode." RE-242, PageID 4662-65. Extensive testimony from multiple witnesses established that the Endosee cannulas were used and reused until they were seized on April 16, 2024. Search warrant photos showed the devices were in a ready state under the sink or on the countertop of exam rooms. Two of the devices had writing on them indicating that they were "working." All of this allowed the jury to infer that the Endosee bases had been put in demo mode and the "kill switch" function thereby disabled.

The next device Kumar raises is the LiNA OperaScope Biopsy Forceps. Def. Mot. for New Tr., RE-287, PageID 7252. He claims that the forceps could not have been reused on or about April 16, 2024[2] because they were "designed to work with the LiNA handheld device only." *Id*. But

---

[2] The defendant refers to April 26, 2024, but the government interprets 26 as a typo meaning to be 16, the day of the search warrant execution at Poplar Avenue Clinic.

Adam Remoll testified that the LiNA grasper forceps could work with other systems, not just the LiNA handheld device as Kumar claims.   RE-242, PageID 4667, 4676. Medical Assistant Gayla Cheatham explained that the grasper forceps could be used to "take polyps out … or it was used to grab an IUD that was imbedded in the uterus." *Id*. at 4520. When asked specifically about what was elsewhere identified as a LiNA OperaScope Biopsy Forceps depicted in Bates 3699 of Exhibit 16, Ms. Cheatham affirmed that this grasper forceps was available for patient use. *Id*. at 1890. Two other grasper forceps later identified as LiNA OperaScope Biopsy Forceps were acknowledged by Ms. Cheatham in the under-sink area depicted at Bates 3884 from Exhibit 14. *Id*. at 1868. The exhibit shows a bucket containing various medical instruments with a label attached with date range April 12, 2024 to April 26, 2024. Tr. Exh. 14, Bates 3884. Contrary to Kumar's assertions, the evidence was clear that the LiNA OperaScope Biopsy Forceps could have been used with other systems and was available for patient use on April 16, 2024.

Kumar next raises the UroViu Hystero-V Hysteroscope. Def. Mot. for New Tr., RE-287, PageID 7252. He claims that "no rational juror could have concluded beyond a reasonable doubt that those devices were Hystero-V cannulas" because the Uro-V looks the same as the Hystero-V. But sales records summarized through Special Agent Brian Kriplean showed that Poplar Avenue Clinic had acquired 32 of the Hystero-V cannulas prior to the search warrant as compared to only four Uro-V cannulas during that same time. Tr. Exh. 157. Additionally UroViu Vice President of Sales Andrew Moore was handed Exhibit 46, an item of evidence that the government seized during the search warrant, and asked Moore what it was, to which he responded, "[t]his is the Hystero-V cannula."   RE-242, PageID 4598. With this in court identification, the jury acted rationally in its determination that the devices seized during the search warrant were in fact Hystero-V cannulas as charged in the Indictment.

The evidence at trial supported the guilty verdicts returned against Kumar in Counts 1 through 33 and Count 35 of the Indictment. Viewing the evidence in the light most favorable to the government, Kumar held and caused to be held the devices charged on or about April 16, 2024 in insanitary conditions. Those devices that were single use devices were not correctly labelled as being reprocessed single use devices. Furthermore, evidence at trial established sufficient basis for the jury to rationally find that the same devices were available for use and correctly identified in the Indictment. It is evident from the jury's failure to return verdicts on Counts 34 and 36 that the jurors carefully reviewed the evidence as they were not unanimously persuaded beyond aa reasonable doubt on those two counts. This shows an attentive and carefully deliberative jury. Finally, there is no basis for a new trial.

### III.    One inadvertent *Jencks* violation does not warrant a new trial when it was remedied during cross-examination.

Each alleged discovery violation was addressed in the United States' Response in Opposition to Defendant's Renewed Motion for Mistrial, RE-266. As defendant has not presented new allegations or arguments, the United States does not respond individually to the previous claims. The United States maintains that there has been only one *Jencks Act* violation and that it was not intentional or in bad faith and did not prejudice the defendant. Defense admitted the evidence at issue during cross-examination as Exhibit 161. Thus, no remedy is warranted.

### IV.    The held for sale jury instruction did not create an intent-only crime.

According to Kumar, the Court's "jury instruction defining 'held for sale' allowed a conviction with no proof of any act beyond Dr. Kumar's intent." Def. Mot. for New Tr., RE-287, PageID 7253. The jury instructions set out three elements each for adulteration and misbranding charges. Those elements have been set out *supra*. The held for sale element was the second element. The third element was the one the Court ruled could by "the 'holding' or 'storing' itself"

10

constitute a violative act." Order Denying Motions to Dismiss, RE-194, PageID 1803.

The cases Kumar cites are no help to him. In *Lambert v. State*, the Oklahoma Court of Criminal Appeals upheld the state statute at issue which prohibited the possession of intoxicating liquor with unlawful intent to sell. 374 P.2d 783, 785 (Okla. Crim. App. 1962). The court there examined all the elements of the offense and noted "the additional element that the possessor had not 'first procured a license therefor from the Oklahoma Alcoholic Beverage Control Board.'" In *People v. Belcastro*, the defendant was convicted of being a "vagabond." 190 N.E. 301, 302 (Ill. 1934). The problem with the criminal code in question was that it "[sought] to punish an individual for what he is reputed to be, regardless of what he actually [was]." *Id*. at 303. And in *United States v. Resindiz-Ponce*, the Supreme Court held that an indictment alleging attempted illegal reentry "need not specifically allege a particular overt act" in support of the attempt element because "'attempt' as used in common parlance connote[s] action rather than mere intent." 549 U.S. 102, 107 (2007). These cases support the government's position. All elements must be examined for an actus reus, not just the isolated second element that Kumar focuses on. The third element for adulteration and misbranding contains action. The jury was instructed properly and did not convict Kumar merely of his thoughts or what he was reputed to be. Kumar's claim here is without merit.

## V.  The manifest weight of the evidence supports the health care fraud convictions.

The jury convicted Kumar on Counts 38, 40, 41, 44, 45, and 46, all asserting the crime of health care fraud pursuant to 18 U.S.C. § 1347. The jury was unable to reach a consensus as to Counts 37, 39, 42, and 43, and a mistrial was declared as to those counts. Kumar challenges the validity of his six health care fraud convictions, arguing that the evidence was insufficient to sustain those convictions. The motion must be denied, as Kumar's arguments fall woefully short of meeting his heavy burden to demonstrate the jury's verdict on the health care fraud counts is

either supported by insufficient evidence or against the manifest weight of the evidence.

This Court already considered and denied Kumar's previous, near-identical Rule 29 motion stating these same ground of the government proving the performance of unnecessary procedures. Def. Mot. for Acquittal, RE-249;  RE-290, PageID 7297-7299, beginning at line 10. The Court should deny this Rule 33 motion for the same reasons.

Kumar does not cite any caselaw supporting his contention that the testimony of Dr. Matt McDonald, a Rule 702 testifying expert, was insufficient to establish the applicable standard of professional practice in terms of the medical necessity of hysteroscopy with biopsy. He cites to *United States v. Singh* generally to assert that medical necessity must be established through the testimony of an expert rather than a lay witness. Def. Mot. for Acquittal, RE- 287, PageID 7256; *see also* Def. Mot. for Acquittal, RE- 249, PageID 5628 (citing *United States v. Singh*, 147 F.4th 652, 662–63 (6th Cir. 2025)). However, Kumar fails to cite any caselaw that proper expert testimony <u>alone</u> cannot establish the standard for medical necessity. *Singh* and its related cases make clear that the testimony of a qualified expert witness is necessary —and can be sufficient— to establish the medical necessity of a procedure. 147 F.4th at 662 (citing *United States v. Hunt*, 521 F.3d 636, 645 (6th Cir. 2008) (crediting expert testimony that "an in-person examination would have been required" to determine whether diagnostic tests were medically necessary); *United States v. Martinez*, 588 F.3d 301, 307–08, 313 (6th Cir. 2009) (crediting expert opinions that the defendant's procedures and prescriptions were not medically necessary); *United States v. Volkman*, 797 F.3d 377, 389–90, 393–96 (6th Cir. 2015) (crediting expert testimony in evaluating whether prescriptions were written for a "legitimate medical purpose"). As this Court held in its first ruling on this issue, "the idea that there has to be a quote, objective standard, just isn't right. I mean, it would -- that would mean that every determination on a medical issue would have to have

a number attached to it, and as to whether it could be done or not, and that is not what the law says.

[A witness] with specialized knowledge can say this is what we do in the medical field, this is the

medical necessity of this particular procedure and, you know, here's my conclusion as to whether

there is a medical necessity or not."   RE-290, PageID 7298.

Kumar also cites to *United States v. McLean*, a Fourth Circuit case, for the proposition that

the government must establish an "objective standard" as to medical necessity. RE- 287, PageID

7256; *see also* Def. Mot. for Acquittal, RE- 249, PageID 5627 (both citing *United States v.

McLean*, 715 F.3d 129, 141 (4th Cir. 2013)). However, the *McLean* case itself notes that testimony

from an expert as to the standard of professional practice, even where no specific guidance

document exists, and even when there are subjective elements in the standard, is sound evidence.

715 F.3d at 138 ("Finally, although [the government's expert] admitted that angiogram reading is

subjective, he testified that physicians should be in the same ballpark and inter-reviewer variability

should not exceed 10% to 20%.").

Kumar further cites *United States v. Paulus* for the proposition that "the false-statement

and fraud statutes require proof, beyond a reasonable doubt, that the defendant made a statement

"capable of confirmation or contradiction." Def. Mot. for Acquittal, RE- 287, PageID 7256; *see

also* Def. Mot. for Acquittal, RE- 249, PageID 5627 (both citing *United States v. Paulus*, 894 F.3d

267, 275 (6th Cir. 2018)). But *Paulus* discusses, over seven subsequent paragraphs, how this

standard is properly supported through the opinion testimony of expert witnesses. "These opinions,

having been accepted into evidence, are sufficient to carry the government's burden of proof. . . If

one juror had a reasonable doubt about the persuasiveness of the government's experts, he or she

could have prevented the jury from returning a guilty verdict. But the court may not enter a

judgment of acquittal merely because it doubts the persuasiveness of the government's expert

13

testimony." *Id.* (citing *Richardson v. United States*, 526 U.S. 813, 817, 119 S.Ct. 1707, (1999)).

Kumar claims, without any citation to the record, that Dr. McDonald testified solely to his personal practice and medical judgment. This is false. Dr. McDonald repeatedly testified, based on his training and experience as a gynecological oncologist, as well as his review and knowledge of peer-reviewed literature, as to the generally accepted standard of professional practice within his specialty. *See, e.g.,* RE-220, PageID 3058-59. The government also introduced the testimony of Daniel Coney and Dr. Jona Bandyopadhyay to explain medical necessity from the perspective of the government health care benefit programs.

The government entered substantial evidence as to the applicable standard of medical necessity and the jury's verdict is sound.

Kumar cites only his own medical records in arguing that the manifest weight of the evidence in Counts 38 and 45 was insufficient to support a conviction of health care fraud by means of fraudulent medical record documentation. However, there is more than sufficient evidence in the record to support such a finding. The jury could find that the testimony of Patients 2 and 9 as to their own bodily symptoms credible and reject Kumar's medical record documentation and testimony. Additionally, in Counts 38 and 45, the government asserted alternative means—that the procedures were medically unnecessary—by which the crime of health care fraud was committed. "A federal jury need not always decide unanimously which of several possible sets of underlying brute facts make up a particular element, say, which of several possible means the defendant used to commit an element of the crime." *Richardson v. United States*, 526 U.S. 813, 817 (1999) (citing *Schad v. Arizona*, 501 U.S. 624, 631–632 (1991)). There was more than sufficient evidence supporting the convictions in Counts 38 and 45 and those convictions must stand.

14

As to the third element of health care fraud, the Court instructed the following: "[t]hat the defendant had the intent to defraud." RE- 261, PageID 6984. The Court further instructed the jury that "you should not be concerned about whether the evidence is direct or circumstantial. . . The law makes no distinction between direct and circumstantial evidence." *Id.* at 6953. Direct evidence of intent to commit fraud is not necessary—circumstantial evidence from which a jury could draw reasonable inferences of intent to commit fraud will suffice. *United States v. Washington*, 715 F.3d 975, 980 (6th Cir. 2013); *see also United States v. Anderson*, 67 F.4th 755, 2023 WL 2966356, at *11 (6th Cir. Apr. 17, 2023) (per curiam). "A jury may consider circumstantial evidence of fraudulent intent and draw reasonable inferences therefrom. Intent can be inferred from efforts to conceal the unlawful activity, from misrepresentations, from proof of knowledge, and from profits." *United States v. Davis*, 490 F.3d 541, 549 (6th Cir. 2007). The Court further instructed the jury that "[i]f the evidence in this case leaves you with a reasonable doubt as to whether the defendant acted with an intent to defraud or in good faith, you must acquit the defendant." RE- 261, PageID 6990.

WhatsApp messages between Ms. Alaeddin Hussein and Kumar were introduced which clearly corroborate her testimony that he was profit-minded. On August 28, 2019, Kumar said "If u learn the lingo I told today n use it You can do lina on all new pts" after she congratulated him on his new pool. Tr. Exh. 118. When Ms. Alaeddin Hussein messaged him that 58558 paid 1000, Kumar responded with "Feel like fucking u in the club." Tr. Exh. 119. Kumar testified for almost eight hours, and did not dispute any of these messages, nor did he offer any alternate explanation.

Mr. Coney and Jacob Stroup, a law enforcement analyst for the State of Tennessee, also introduced summary exhibits illustrating that Kumar's rate of billing for hysteroscopy procedures far outpaced all similarly situated health care providers in Tennessee and placed him at the top

nationwide. This important context is further circumstantial evidence of Defendant's intent to defraud government health care benefit programs.

In sum, Kumar urges the Court to sit as a thirteenth juror and find the jury's split verdict on his health care fraud convictions to be against the manifest weight of the evidence. In doing so, Kumar cherry-picks testimony and falsely states that the government's only evidence of Kumar's intent to commit fraud was a text message with Ms. Alaeddin Hussein and a comment made to Dr. Adio Abdu. Even if this were the only evidence, the jury could rationally conclude that Ms. Alaeddin Hussein and Dr. Adio Abdu were credible and find that Kumar acted with an intent to defraud. The evidence at trial was overwhelming and Kumar's motion must be denied.

The evidence at trial overwhelmingly supports conviction on Count 46. Kumar claims that the government failed to present evidence that he implemented a plan to defraud government health programs through the use of adulterated devices and failed to present evidence that use of FDA-approved devices was a condition material to payment. Both claims fail.

As to the use of adulterated devices, Kumar's employees gave consistent testimony that the "towers," i.e. hysteroscopy devices that were intended to be reprocessed, were not used until the summer of 2023. Prior to the summer of 2023, as Kumar's employees uniformly testified, only the single use devices were used. However, Kumar's clinic treated thousands of Medicare and Medicaid patients with hysteroscopy with biopsy procedures from September 2019 through summer 2023. It is impossible, based upon the purchases, for each and every one of those beneficiaries to have received a brand-new device out of the sterile packaging.

Defendant cites to *Universal Health Servs., Inc. v. United States ex rel. Escobar*, 579 U.S. 176, 194 (2016), a case considering the civil False Claims Act and not the criminal health care statute, to claim that the government failed to demonstrate that using non-adulterated devices on

Medicare beneficiaries and Medicaid recipients was a condition material to payment. This argument is preposterous and fails. As this Court correctly instructed the jury, "[a] misrepresentation or concealment is 'material' if it has a natural tendency to influence or is capable of influencing the decision of a person of ordinary prudence and comprehension." RE-261, PageID 6986. The key question, then, is whether a person of ordinary prudence and comprehension would deny a claim for services if they knew that the procedure was performed with a device (whether single use or not) that was soaked in a plastic bin of Cidex as its only means of reprocessing. Even without the expert testimony offered by the government at trial, the answer to this question is clear. The jury could plainly determine, as "persons of ordinary prudence and comprehension," that re-using a dirty device would mean that a health care benefit program would deny payment for the service.

Moreover, the testimony of Daniel Coney, the government's Rule 702 witness as to Medicare and Medicaid rules and regulations, clearly established materiality. Mr. Coney testified that if Medicare or Medicaid was aware that Defendant was using adulterated devices, the claims would not be paid. RE-234, PageID 3652. The government's evidence at trial was overwhelming, and Kumar's motion should be denied as it relates to this claim.

## VI.    The entrapment by estoppel instruction was not warranted.

According to Kumar, "the Court should have given an entrapment by estoppel instruction to the jury related to the Guideline for Disinfection and Sterilization in Healthcare Facilities, 2008, published by the CDC." Def. Mot. for New Tr., RE-287, PageID 7262. "Entrapment by estoppel applies when an official tells a defendant that certain conduct is legal and the defendant believes that official to his detriment." *United States v. Triana*, 468 F.3d 308, 316 (6th Cir. 2006). "[A] defendant must show that … a government agent announced that the charged conduct was legal."

*Id*. The government need not address the other two elements because, like in *Triana*, Kumar "fail[s] to put forth evidence sufficient to satisfy the first prong of the entrapment by estoppel test." *Id*.

No government agent in the case announced that high level disinfection was adequate for reprocessing hysteroscopes for hysteroscopy. On the contrary, Dr. Poulomi Nandy, who testified as a person with specialized knowledge that sterilization, not high level disinfection, was required to adequately reprocess a hysteroscope. RE-235, PageID 3722, 3738. Dr. Nandy explained that "[e]ndoscopes is a very broad term as in there are different types of endoscopes. And depending on where they are used, their categorization is going to change." *Id*. at 3778. She stated, "hysteroscopes which are used to perform diagnostic or surgical procedures in the uterus would be considered a critical device" requiring sterilization "because they're going into the uterus." *Id*. Kumar refers to a CDC guidance document[3] that presents "recommendations on the preferred methods for cleaning, disinfection and sterilization of patient-care medical devices and for cleaning and disinfecting the healthcare environment." There are no recommendations specific to hysteroscopes. Consequently, no government agent announced that the charged conduct was legal.

Lastly, Kumar's argument suggests he was convicted because he was high level disinfecting hysteroscopes when they should have been sterilized. He was not. The Indictment alleged adulteration of hysteroscopes based on using decontamination methods that "did not adequately reprocess the devices and caused them to be held in insanitary conditions whereby they may have been contaminated with filth, or whereby they may have been rendered injurious to health before use on future patients." Sec. Superseding Indictment, RE-135, PageID 1167-68, 1181, 1185. The evidence at trial bore this out. As Dr. Nandy explained, Kumar's attempted

---

[3] Guideline for Disinfection and Sterilization in Healthcare Facilities, 2008,
https://www.cdc.gov/infection-control/media/pdfs/guideline-disinfection-h.pdf, last accessed
February 11, 2026.

methods of reprocessing were "not even achieving high level disinfection." RE-235, PageID 3762.

As to Counts 1 through 33, 35, and 46, the jury agreed, and its conclusion based on the evidence

was rational. Because no government agent announced that Kumar's inadequate reprocessing

methods were lawful, the entrapment by estoppel instruction was not warranted.

**VII.    Hysteroscopes charged in indictment were held for sale.**

Kumar claims "[n]either single use nor multi-use hysteroscopes were 'held for sale' under

the FDCA when used in the course of treating patients at Poplar Avenue Clinic." Def. Mot. for

New Tr., RE-287, PageID 7263-64. Kumar applies this argument to Counts 1 through 36. *Id*. at

7265. But as to the single use devices, Counts 1 through 32, the Court already ruled that "[t]he

single use devices in [Kumar's] clinic were indeed 'held for sale.'" Order Granting in Part and

Denying in Part, ECF 124, PageID 1052. Following the law-of-the-case doctrine discussed *supra*,

the Court should deny Kumar's legal claims here as to Counts 1 through 32 because the decision

made by the Court at that earlier stage of a case should be given effect in this later stage of the

same case. In terms of sufficiency of the evidence on this theory, Kumar claims that "not one

witness testified that the devices charged in Counts 1 through 36 were reused on patients on April

16, 2024." For the reasons stated *supra* in Section II, the Court should reject this claim.

Counts 33 and 35 present a slightly different case status. These two counts charged

adulteration of reusable hysteroscopes, which were not addressed by the Court in the

aforementioned order at ECF 124. However, during Kumar's oral Rule 29 motion on December

16, 2025, Kumar did raise the issue of "held for sale" as it relates to Counts 33 through 36, claiming

that the reusable hysteroscopes were less deserving of the protections of the FDCA than the single

use hysteroscopes. RE-304, PageID 9757-65. The Court orally ruled on the issue on December 19,

2025, stating, "my conclusion is that these devices were held for sale because they were intended

to be sold or used in the course of treating a patient." RE-256, PageID 6290. The Court relied on *United States v. Diapulse Corporation of America*, where the Second Circuit held that a particular reusable medical device called the Diapulse, "used in the treatment of patients, may properly be considered 'held for sale' within the meaning of the Food, Drug, and Cosmetic Act." 514 F.2d 1097, 1098 (2d Cir. 1975). During Kumar's trial, testimony established that reusable hysteroscopes were reused in patient rooms and were available for patient use on April 16, 2024. *See, e.g.*, RE-203, PageID 1859-62. And relevant to the issue of held for sale, Mr. Coney testified that one of the components of Medicare and Medicaid reimbursement was for "practice expense," which included "supplies to do the medical procedures."   RE-234, PageID 3649-51.

Whether the hysteroscope used was single use or reusable, requiring a cost of reprocessing, the reimbursement covered it as "practice expense." Further, "the FDCA is to be interpreted broadly in order to protect public health." *United States v. Kaplan*, 836 F.3d 1199, 1208 (9th Cir. 2016). "Even a physician can make a product dangerous for a patient if the product is utilized improperly." *Id*. at 1210. Because of the mandate to interpret broadly to protect public health, this Court should apply equally to the reusable hysteroscopes, whose reimbursement includes the cost of reprocessing, the analysis whereby it concluded that the charges concerning single use devices sufficiently pled the "held for sale" element. Order Granting in Part and Denying in Part, RE-124, PageID 1050-52. For these reasons, Kumar's motions as to Counts 33 and 35 should be denied.

## CONCLUSION

Based on the foregoing reasons, the request for a *Remmer* hearing is not ripe without additional testimony and evidence received. Kumar's additional arguments are without merit and regardless of which standard is applied, the motion should be denied on all grounds.

Respectfully submitted,

D. Michael Dunavant
United States Attorney

By:      /s/ Lynn Crum_____
Lynn Crum (CA #322077)
Scott Smith (TN #033551)
Sarah Pazar Williams (TN #031261)
Assistant United States Attorney
167 N. Main Street, Suite 800
Memphis, TN 38103
Telephone: (901) 544-4231
lynn.crum@usdoj.gov

## CERTIFICATE OF SERVICE

I, Lynn Crum, Assistant United States Attorney, do hereby certify that a copy of the foregoing pleading was forwarded by electronic means via the Court's electronic filing system, and via email to the attorneys for the defendant.

This 11th day of February, 2026.

                                 /s/ Lynn Crum_____
                               Assistant United States Attorney