**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
WESTERN DIVISION**

UNITED STATES OF AMERICA,

    Plaintiff,

v.                                  No. 2:25-cr-20032-SHL-1

SANJEEV KUMAR,

    Defendant.

**DEFENDANT SANJEEV KUMAR'S SENTENCING MEMORANDUM
REGARDING DISPUTED GUIDELINE ENHANCEMENTS**

Dr. Kumar objects to the guideline calculations in Draft PSR paragraphs 108 through 113 and to the additional enhancements requested in the government's Position Regarding Draft Presentence Report, ECF No. 348, at PageID 10095–98. The government bears the burden of proving each disputed enhancement by a preponderance of the evidence, and disputed sentencing facts must rest on information with "sufficient indicia of reliability to support its probable accuracy." U.S.S.G. Sec. 6A1.3(a) (2025). The Court also must rule on disputed sentencing matters rather than merely adopt the PSR's conclusions. Fed. R. Crim. P. 32(i)(3)(B); *United States v. White*, 492 F.3d 380, 414–15 (6th Cir. 2007). Because the PSR itself applies the 2025 Guidelines Manual, this memorandum does the same. *See* Final PSR, ECF 403, ¶ 107. If the Court concludes that an earlier manual controls under U.S.S.G. Sec. 1B1.11, the acquitted-conduct point in Section I narrows, but the indictment, verdict, and reliability objections remain the same.

The government's sentencing theory depends on one premise above all others: that Count 46 and the mixed healthcare-fraud verdict permit the Court to treat every Medicare and Medicaid

hysteroscopy claim from September 2019 through April 2024 as a fraudulent, medically unnecessary, and fully nonreimbursable claim. The charge, the verdict form, the Rule 29 record, and the trial proof do not support that leap. Once that premise is rejected, the PSR's '+24' loss increase, '+2' victim increase, and '+4' government-health-care-program increase cannot stand as written, and the government's added requests fail for independent reasons.

**I.    Count 46 and the Government's Relevant-Conduct Theory Do Not Authorize a Universal All-Patient Loss Finding.**

The Court may not use Count 46, the mixed healthcare-fraud verdict, or a generalized relevant-conduct theory to treat all Medicare and Medicaid hysteroscopy claims during the charged period as proven fraudulent, medically unnecessary, and wholly nonreimbursable.

The Court must use the Guidelines Manual in effect on the date of sentencing unless doing so would violate the Ex Post Facto Clause. U.S.S.G. Sec. 1B1.11(a), (b)(1) (2025). Under the current manual, relevant conduct does not include acquitted conduct for guideline-range purposes unless the conduct also establishes the offense of conviction. U.S.S.G. Sec. 1B1.3(c) (2025). And when a defendant is convicted by a jury of a scheme-based offense, the scope of what the conviction established is defined by the indictment and verdict, not by later characterizations of unresolved allegations. See *United States v. Jones*, 641 F.3d 706, 714–15 (6th Cir. 2011). Even beyond the conviction itself, sentencing facts must still be proved with reliable evidence. U.S.S.G. Sec. 6A1.3(a) (2025).

Count 46 was not charged as a universal medical-necessity count. The second superseding indictment alleged that Kumar submitted "claims for reimbursement for hysteroscopy services" that were false because he "falsely attested that he followed all pertinent rules and regulations in providing these services, including that the devices used during the procedures comported with all applicable regulations and were approved for use in patient care."

2

Second Superseding Indictment at PageID 1193. The Court read Count 46 to the venire in the same narrowed form. Trial Tr. (Dec. 1, 2025) at PageID 7905–06. The verdict form likewise asked only whether Kumar was guilty "of health care fraud for claims for reimbursement for hysteroscopy services, beginning at a time unknown, but no later than September of 2019, and continuing to April 2024." Jury Verdict Form at PageID 7060.

Patient-specific healthcare-fraud counts were separately structured, separately submitted, and returned in mixed form. The jury reached no verdict on Counts 37, 39, 42, and 43, returned only partial guilty findings on Counts 38 and 45, and found guilt on the remaining listed executions only as the form specified. Jury Verdict Form at PageID 7052–60; Trial Tr. (Jan. 7, 2026) at PageID 9858–59. So the verdict does not remotely amount to a unanimous jury finding that every hysteroscopy claim in the Count 46 period was unnecessary or fraudulent on all possible theories.

The Rule 29 record confirms that Count 46 went to the jury on a broad false-attestation/inventory-theory footing, not on a patient-by-patient overutilization theory. Before the case went to the jury, defense counsel argued that Count 46 was "not limited to a specific patient population," alleged a "wide-ranging scheme," and was being used by the government to say "his whole practice is dirty." Trial Tr. (Dec. 18, 2025) at PageID 5896–97. During the Rule 29 colloquy, defense counsel argued that the government had "not tied a device to a patient," and had not tied a device "to specific healthcare claims submitted to Medicare or Medicaid". Tr. (Dec. 16, 2025) at PageID 9487–88, 9492, 9496. The government answered that a patient-specific or claim-specific tie was "just not true" and that the device-count and procedure-volume evidence made it "impossible for him to have not filed a false claim" during

3

the period. *Id*. at PageID 9488–89, 9494–95. The Court denied Rule 29 while noting the charge's "pretty broad language" and the inventory-style proof. *Id*. at PageID 9499–9500.

That exchange is decisive at sentencing. The government cannot defeat Rule 29 by arguing that Count 46 did not require patient-specific proof, then convert the same broad theory into a verdict-backed finding that every Count 46 hysteroscopy was medically unnecessary and fully nonreimbursable. If the government wanted a universal overutilization verdict, it knew how to charge date-specific healthcare-fraud executions, and the verdict shows the jury did not unanimously adopt that theory across the board.

The current Guidelines reinforce that conclusion. Section 1B1.3(c) now excludes acquitted conduct from relevant conduct for guideline-range purposes. U.S.S.G. Sec. 1B1.3(c) (2025). To be sure, not every unresolved or unnamed patient claim here qualifies as formal acquitted conduct. But the amendment still underscores the core principle that the advisory range should track what the verdict *actually established* and what the government can reliably prove, not what it merely alleged across a much larger patient universe.

The government's fallback invocation of "relevant conduct" does not solve the problem. Relevant conduct is not a label that converts unresolved allegations into established facts. To move beyond what Count 46 itself established, the government still must prove with reliable evidence that the additional claims it wants counted were part of the same course of conduct and were in fact fraudulent, medically unnecessary, or wholly nonpayable. U.S.S.G. Secs. 1B1.3(a), 6A1.3(a) (2025). The mixed verdict, the Rule 29 record, the overinclusive billing data, and the patient-specific evidence of legitimate care all show that the government has not made that showing here.

4

The Court should reject the government's effort to recast Count 46 as a verdict-backed finding that all Medicare and Medicaid hysteroscopy patients during the charged period received medically unnecessary and wholly nonreimbursable procedures.

Even under the older acquitted-conduct cases, the government overstates what federal sentencing law allows. The en banc Sixth Circuit held in *United States v. White* only that, after *Booker*, a district court may consider acquitted conduct proved by a preponderance if the sentence remains within the statutory maximum authorized by the jury's verdict. 551 F.3d 381, 383–86 (6th Cir. 2008) (en banc). *White* simultaneously made clear that sentencing judges are not required to do so: a court may impose a lower sentence that effectively negates an acquitted-conduct enhancement if the resulting guideline recommendation does not properly reflect the purposes set out in 18 U.S.C. § 3553(a). *Id*. at 386. And *United States v. Watts*, 519 U.S. 148, 154–57 (1997), held only that a jury's acquittal does not bar a sentencing court from considering acquitted conduct proved by a preponderance, and it rejected a Double Jeopardy objection to that practice under the then-mandatory Guidelines. But *Watts* addressed only whether such conduct *may* be considered at all; it did not authorize treating an acquittal, or a mixed verdict, as an affirmative finding of guilt, and it said nothing about the reliability the evidence must carry. *United States v. Booker*, 543 U.S. 220, 233–44, 259–65 (2005), later held that judge-found facts could not drive a higher mandatory guideline sentence and made the Guidelines advisory. So neither *Watts* nor *White* authorizes the Court to treat Count 46 as if the jury unanimously found that every hysteroscopy claim in the charged period was medically unnecessary and wholly nonreimbursable.

The Sixth Circuit has likewise warned against turning § 1B1.3 into a label that swallows meaningful limits. In *United States v. Hill*, the court held that conduct qualifies under the broader

5

§ 1B1.3(a)(2) theory only if the government satisfies the guideline's similarity, regularity, and temporal-proximity framework, using a sliding scale that requires stronger proof when one factor is weak or absent. 79 F.3d 1477, 1484–85 (6th Cir. 1996). *Hill* rejected a relevant-conduct finding where the earlier event was remote, isolated, and similar only at an impermissibly high level of abstraction, cautioning that courts may not describe conduct "at such a level of generality" that the inquiry is "eviscerate[d]." *Id*. at 1483–87. And in *United States v. Schock*, the Sixth Circuit stressed that the Guidelines draw real distinctions between different relevant-conduct theories and that the line between § 1B1.3(a)(1) and § 1B1.3(a)(2) "is one we must respect." 862 F.3d 563, 567–69 & n.6 (6th Cir. 2017). Those cases matter here because the government's Count 46 position depends on defining thousands of procedures, across years and varying patient circumstances, at the highest possible level of generality and then calling the entire universe the "same course of conduct." *Hill* and *Schock* reject that kind of abstraction-driven expansion.

Recent Sixth Circuit precedent also underscores that sentencing cannot simply overwrite concrete jury findings with a broader judge-found narrative. In the first *McReynolds* appeal, the court held that the district judge was authorized to go beyond the jury's drug-quantity findings only insofar as the higher amounts were actually supported by a preponderance of the evidence. *United States v. McReynolds*, 964 F.3d 555, 565–66 (6th Cir. 2020). On remand, when the district court again used conspiracy-wide quantities and attributed the gap to supposed jury confusion, the Sixth Circuit vacated a second time, holding that the record did not support the broader attribution and warning that using facts contrary to the jury's affirmative determinations risks creating a "shadow criminal code" under which a defendant receives fewer trial protections for conduct the jury did not authorize punishment for. *United States v. McReynolds*, 69 F.4th 326,

327–29, 334–35 & n.8 (6th Cir. 2023). That reasoning fits Kumar. Once the government moves beyond what the jury actually found on Count 46 and the mixed patient-specific verdicts, it must prove the expanded sentencing universe with reliable evidence rather than simply insisting that the broad guilty verdict lets the Court fill in every disputed patient, claim, and medical-necessity issue for itself.

Finally, recent Supreme Court statements reinforce the institutional point that sentencing should respect the line the jury actually drew. In *McClinton v. United States*, Justice Sotomayor explained that using acquitted conduct to increase a Guidelines range raises serious questions about fairness, the jury's historic role as a "bulwark between the State and the accused," and public confidence in the criminal justice system because acquittals have long been accorded "special weight." 143 S. Ct. 2400, 2401–03 (2023) (Sotomayor, J., statement respecting denial of certiorari). Justice Kavanaugh, joined by Justices Gorsuch and Barrett, likewise recognized that acquitted-conduct sentencing presents "important questions." *Id*. at 2403 (Kavanaugh, J., respecting denial of certiorari).

## II.    The PSR's +24 Loss Enhancement Under Sec. 2B1.1(b)(1)(M) Is Unsupported.

The government did not prove by reliable evidence that Kumar is responsible for more than $65 million in loss, as the PSR states.

Under the current Guidelines, loss is "the greater of actual loss or intended loss." U.S.S.G. Sec. 2B1.1(b)(1), tbl. n.(A) (2025). The Court need only make a reasonable estimate of loss, but that estimate must be grounded in available information and reliable fact finding. U.S.S.G. Sec. 2B1.1 cmt. n.3(B) (2025); *United States v. Wala*, 166 F.4th 583, 596-97 (6th Cir. 2026). In federal healthcare-fraud cases involving government programs, the aggregate dollar amount of *fraudulent* bills submitted constitutes prima facie evidence of intended loss. U.S.S.G.

Sec. 2B1.1 cmt. n.3(E)(viii) (2025). But that prima facie rule does not erase the requirement to separate legitimate medical value from fraudulent claims where the record permits it. *United States v. Clay*, 162 F.4th 757, 774–75 (6th Cir. 2025); *United States v. Mehmood*, 742 F. App'x 928, 940–41 (6th Cir. 2018). If fraud is truly pervasive and separating legitimate from fraudulent claims is not reasonably practicable, the government may use a whole-billings approach and the burden shifts to the defense to prove a specific reduction. *United States v. Betro*, 115 F.4th 429, 444–46 (6th Cir. 2024); *United States v. Lovett*, 764 F. App'x 450, 460 (6th Cir. 2019). But there is no automatic exemption from reliability review merely because the government has decided to not sample claims and properly extrapolate. *Jones*, 641 F.3d at 712.

Outside the Sixth Circuit, courts confronting disputed sentencing loss numbers do not simply accept a government narrative and fill in the rest. In *United States v. Walker*, the Eastern District of Pennsylvania rejected the government's extrapolation theory as insufficiently reliable and used gain instead of the claimed loss. No. 2:09-cr-478, slip op. at 11 (E.D. Pa. July 28, 2011). In *United States v. Yan Zhu*, after acquittals on the broader trade-secret counts, the District of New Jersey refused any loss enhancement because the government failed to prove financial loss by a preponderance. No. 3:09-cr-722, slip op. at 9–10 (D.N.J. Feb. 2, 2012). In *United States v. Berger*, the Western District of Pennsylvania declined to accept the government's across-the-board average-loss formula where defense analysis created substantial doubt about that methodology and instead fixed a materially lower tailored loss figure. No. 2:09-cr-308, slip op. at 18–19, 36 (W.D. Pa. June 26, 2012). And in *United States v. Kowal*, the Northern District of Iowa refused to include a claimed loss component supported only by hearsay because sentencing evidence still must carry sufficient indicia of reliability. No. 06-cr-133, slip op. at 15 (N.D. Iowa Oct. 2, 2007).

The courts of appeals articulate the same discipline. In *United States v. Newton*, the Seventh Circuit held it was clear error to begin with a 90% fraud assumption because only speculation supported the premise that 90% of Medicare reimbursements were fraudulent. 76 F.4th 662, 674 (7th Cir. 2023). In *United States v. Gupta*, the Eleventh Circuit reversed where the district judge simply "pick[ed] a figure . . . about half way in between" competing estimates rather than making factual findings and an actual calculation. 572 F.3d 878, 886    (11th Cir. 2009). In *United States v. Hall*, the D.C. Circuit remanded where the sentencing court gave no reason for finding loss in excess of $1 million. 610 F.3d 727, 745 (D.C. Cir. 2010). And in *United States v. Burns*, the Seventh Circuit treated it as plain error to impose a loss enhancement without specific factual findings. 843 F.3d 679, 688–89 (7th Cir. 2016). Those cases reject exactly the shortcut the government urges here: once some fraud exists, the court may not simply choose a large number that feels directionally right.

Healthcare and government-benefits cases are even more demanding when some claims or services may have been legitimate. In *United States v. Klein*, the Fifth Circuit held that loss had to be reduced by the value of drugs patients actually needed, 543 F.3d 206, 213–15 (5th Cir. 2008), and in *United States v. Mahmood* it held that even after moving from gross billings to amounts actually paid, the court still had to credit the fair-market value of legitimate services Medicare would have covered absent the fraud, 820 F.3d 177, 193–96 (5th Cir. 2016). *United States v. Catone* required a government-benefits court to calculate the difference between what the defendant actually received and what he would have received had he been truthful, and held that an estimate unsupported by record evidence cannot be reasonable. 769 F.3d 866, 875–77 (4th Cir. 2014). *United States v. Alphas* likewise rejected an all-or-nothing insurance-loss theory and remanded for a determination of what insurers would have paid on the genuine portions of

9

tainted claims. 785 F.3d 775, 784–86 (1st Cir. 2015) (cited here for its loss-apportionment holding; its pre-2015 discussion of "intended loss" has since been superseded by guideline amendment). And *United States v. Medina* emphasized that a sentencing court must make specific factual findings tying loss to each defendant rather than treating all payments on tainted claims as automatic loss, especially where medically necessary services may have been provided. 485 F.3d 1291, 1304–05 (11th Cir. 2007).

Taken together, these cases show that the government's burden at sentencing is not satisfied by a selected subset of files, a gross-claims spreadsheet, or a conclusory assertion that because some procedures were false or unnecessary, the entire practice-wide universe should be treated as 100% loss. Courts require a defensible method, record-supported factual findings, and a reasoned separation of legitimate value from fraudulent value. Where the government cannot provide that analysis, courts reduce the loss figure, refuse the enhancement, or remand for recalculation. That is the rigor this Court should require here.

The PSR's '$81,441,220.69' figure and the government's fallback '$37,387,836.80' hysteroscopy figure both rest on the same unproven assumption that every hysteroscopy claim belongs in the loss pool. That premise fails for the reasons already discussed. And the trial record independently shows that the datasets the government used are cherry picked and overinclusive.

Daniel Coney conceded that the Medicare chart was "all claims," that it "includes denied claims," that it "would include crossover claims," and that the percentage calculation he used was based on billed amounts rather than paid amounts. Trial Tr. (Dec. 15, 2025) at PageID 8991–92. He further admitted that if a claim were resubmitted, it would show up in billed totals as more than one claim. *Id*. at PageID 8993–94. And when pressed on why he used those numbers, he said the charts were meant to show "what the provider did, not what Medicare did,"

so "on these particular types of charts, it's all claims." *Id*. at PageID 8997. That is not a reliable way to prove actual fraud, and it is not enough by itself to prove intended loss across every hysteroscopy claim in the charged period.

The defense proof also showed why a universal hysteroscopy-loss assumption is unsound. Jordan Johnson testified that paid CPT 58558 claims made up only 8.41 percent of the total paid Medicare dataset and 14.2 percent of the total paid Medicaid dataset. Trial Tr. (Dec. 19, 2025) at PageID 6649. He also testified that only 253 Medicare patients, or 11 percent, received all four codes on the first visit, while 1,957 did not. *Id*. at PageID 6653–54. And he explained that the underlying provider data included "over nine different providers" listed as rendering or billing providers. *Id*. at PageID 6689. Those facts directly undercut the government's effort to use a gross, practice-wide dataset as a clean Kumar-only loss universe.

The payor-review evidence also cuts against the government's claim that all hysteroscopy claims were fraudulent. Michelle Pollet testified that Amerigroup placed 58558 under prepayment review, that during that period "every time that claim is billed somebody at SIU reviews the medical records," and that effective November 23, 2021, prepayment review for 58558 was removed. Trial Tr. (Dec. 18, 2025) at PageID 6038–40. Claims that were subject to pre-payment review satisfied a global review of Amerigroup claims and Amerigroup determined that the claims were proper.

Accepting the Government's loss amount would permit it to deviate from well established statutory requirements. By statute, the Government is only permitted to extrapolate a loss amount in specific situations. Congress and CMS treat extrapolation as a formal proof method, not as a shortcut that permits the Government to assume every claim in a large dataset is false. A Medicare contractor may not use extrapolation to recover overpayments unless the Secretary

11

determines that there is a "sustained or high level of payment error" or that documented educational intervention has failed. 42 U.S.C. Sec. 1395ddd(f)(3). And when CMS contractors do extrapolate, the Medicare Program Integrity Manual requires them to define the universe and sampling frame of similar claims, use a probability sample in which each sampling unit has a known non-zero chance of selection, obtain statistician approval of the methodology, preserve documentation sufficient for replication, and ordinarily calculate recovery using the lower limit of a one-sided 90 percent confidence interval. Medicare Program Integrity Manual, ch. 3, Sec. 3.5.2; ch. 8, Secs. 8.4.1.1, 8.4.1.3–.5, 8.4.2, 8.4.4.4–.5, 8.4.5. Even when the review is supporting a fraud investigation, CMS still requires a "well-accepted" methodology and a complete explanation of why that methodology fits the case. *Id*. ch. 8, Sec. 8.4.1.1.

The cases approving extrapolation confirm the same point: courts accept projection only when the Government actually uses a statistically testable method. *See United States v. Jones*, 641 F.3d 706, 712 (6th Cir. 2011) (loss extrapolation was flawed without a sound representative sample); *Maxmed Healthcare, Inc. v. Price*, 860 F.3d 335, 338–40 (5th Cir. 2017) (describing CMS extrapolation as resting on a statistically valid sample and the MPIM's methodological steps); *Palm Valley Health Care, Inc. v. Azar*, 947 F.3d 321, 323–24 (5th Cir. 2020) (upholding projected overpayment only after the contractor sampled 54 claims from a universe of 10,699 claims); *Chaves Cnty. Home Health Serv., Inc. v. Sullivan*, 931 F.2d 914, 922–23 (D.C. Cir. 1991) (recognizing sampling as the feasible substitute for full review when claim volume is too large); *Ratanasen v. Cal. Dep't of Health Servs.*, 11 F.3d 1467, 1471–72 (9th Cir. 1993) (same, while stressing the provider's opportunity to rebut the sample and extrapolation). In other words, when the Government wants to scale from a subset of claims to a global overpayment figure, the accepted route is valid sampling and valid extrapolation, not assumption.

12

That foundation is missing here. The Government did not present any of the things CMS itself requires before a global projection can be made: no defined probability sample, no documented sampling frame, no statistician-approved methodology, no confidence interval, no lower-bound estimate, and no replicable documentation. Medicare Program Integrity Manual, ch. 8, Secs. 8.4.2, 8.4.4.4–.5, 8.4.5. Instead, it asks the Court to leap from gross billing compilations to a universal loss finding, even though Coney admitted the charts were "all claims," included denied claims, included crossover claims, and could count resubmissions more than once. Trial Tr. (Dec. 15, 2025) at PageID 8991–94, 8997. On this record, the Government has supplied neither a valid extrapolation nor a claim-by-claim alternative sufficient to prove that expanded Count 46 universe by a preponderance of the evidence.

Most importantly, the trial proof itself shows that even the cherry-picked sample provided by the government contains legitimate treatment. Dr. Farzan testified that the hysteroscopy with biopsy he reviewed for Patient 8 "was indicated" and that the hysteroscopies with biopsies he discussed were indicated "to a reasonable degree of medical certainty." Trial Tr. (Dec. 18, 2025) at PageID 5810, 5830. He further explained that "endometrial biopsy alone is not reliable in high-risk patients. Even to repeat the biopsies did not reveal the cancer." *Id*. at PageID 5830.

Even the government's own expert, Dr. McDonald, conceded that some hysteroscopies were medically indicated, undermining the Government's theory that the entire universe of hysteroscopy claims was medically unnecessary. He acknowledged that hysteroscopy is often used to determine why a patient has abnormal bleeding, that endometrial polyps can contain cancer, and that at least one June 24, 2020 hysteroscopy with biopsy was indicated. Trial Tr. (Dec. 8, 2025) at PageID 8437–39, 8482–83. On direct examination, he further admitted that a June 9, 2020 hysteroscopy with biopsy was indicated because the patient was twenty-two years

13

old and complaining of abnormal bleeding. Trial Tr. (Dec. 9, 2025) at PageID 8585. Likewise, with respect to the September 11, 2021 hysteroscopy with biopsy, Dr. McDonald testified, "I would say this one is indicated," agreeing this was a clear case where "we need to get a sample." *Id*. at PageID 8595.

The patient testimony likewise confirmed that these procedures served legitimate diagnostic purposes. Patient testimony reinforced the point. Patient 28 testified that a biopsy done while she was seeing Kumar showed that her cancer was "in 3C stage." Trial Tr. (Dec. 18, 2025) at PageID 5929–30. Patient 27 testified that after her hysterectomy the pathology report showed "full-blown endometrial cancer" after four prior biopsies had been negative. *Id*. at PageID 6024–25. The Government can't even prove pervasive fraud with its cherry-picked data set and therefore cannot possibly prove that all claims were fraudulent.

Despite this clear testimony, the Government's sentencing theory still depends on treating the Count 46 hysteroscopy universe as though every claim in it was medically unnecessary and therefore wholly non-reimbursable. McDonald's own direct testimony disproves that premise. In order to accept the Government's loss amount this court would have to reject Dr. McDonald's testimony and instead insert its own belief that all claims were fraudulent.

Cross-examination weakened the Government's position even further by showing that McDonald's report was not stable on individual claims. With respect to the January 30, 2023 hysteroscopy, McDonald first confirmed that he had previously indicated the procedure was not medically indicated. Trial Tr. (Dec. 9, 2025) at PageID 8657–58. But when defense counsel walked him through the chart reflecting a polyp that had not been removed on the prior hysteroscopy, McDonald changed course and agreed that the January 30 procedure was medically appropriate because "we now need to go back and remove it," ultimately answering, "I

would agree." *Id*. at PageID 8662–65. He then reviewed his own prior report and admitted that the report still said the January 30 procedure was "not indicated." *Id*. at PageID 8665–66. The same cross exposed additional imprecision in the report itself: McDonald acknowledged that his reference to a March 7, 2023 "D&C" was "probably a typo," that "D&C probably wasn't the exact appropriate term," and that "it would have been more appropriate" to say "endometrial sampling." *Id*. at PageID 8685–86. A loss finding measured in the tens of millions cannot rest on a medical review that shifted at trial and that the witness himself acknowledged was not exact.

The record also shows that the Government's reviewed patient set was not the product of any valid sampling-and-extrapolation methodology. McDonald testified that, although he reviewed roughly 11,000 pages of records, he ultimately delivered opinions on only about 23 patients. Trial Tr. (Dec. 9, 2025) at PageID 8629–31. Yet he had "no idea" how those 23 patient files were selected, did not know whether they were chosen through random sampling, could not say whether they were a "cherry picked sample," and admitted he had "no ability to comment" that every patient in Dr. Kumar's practice received unnecessary hysteroscopies. *Id*. at PageID 8647. He likewise did not know how the 10 patients actually presented at trial were selected from the 23 he reviewed and was not involved in choosing them. *Id*. at PageID 8647–48. That is not statistical sampling. It is not extrapolation. And it is markedly weaker than *Jones*, where the Government at least attempted a representative sample and still lost because the methodology was flawed. *See Jones*, 641 F.3d at 712 (6th Cir. 2011). Here, the Government's own medical expert could not identify any randomization, representative design, or extrapolation method at all.

And the Government's billing proof did not supply the missing methodology. Coney admitted that his charts were "all claims," included denied claims and crossover claims, and

15

could count resubmissions more than once; he also explained that the charts were designed to show "what the provider did, not what Medicare did." Trial Tr. (Dec. 15, 2025) at PageID 8991–94, 8997. So the Government offered neither a valid sample from which loss could be extrapolated nor a cleaned claim-level dataset capable of proving actual loss directly. On this record, the Court cannot reliably project from a handful of selected patient reviews to every hysteroscopy claim in the Count 46 period.

The trial record does not support extrapolating from the Government's chosen files to the full Count 46 universe. The Government began with an outlier-billing investigation, not a random review of Dr. Kumar's practice. *See* Trial Tr. (Dec. 2, 2025) at PageID 8068. And when its own medical reviewers were asked how the reviewed patient sets were assembled, none supplied a representative-sampling foundation. Dr. Bandyopadhyay said she was only "reflecting on five individuals" and was not making a "global summary" of the practice, while admitting she did not know whether the five files she reviewed were random or instead a targeted subset from a much larger request. Trial Tr. (Dec. 5, 2025) at PageID 8236, 8249.

Dr. Farzan testified that the nine files sent to him were the patients with the procedures that were charged, with four additional files added partly at his own request; he did not know how the nine were chosen before charge. Trial Tr. (Dec. 18, 2025) at PageID 5885–86. Dr. McDonald gave the same answer for the 23 files he reviewed and the 10 patients presented at trial: he had "no idea" how they were selected, did not know whether they were random or cherry-picked, and had no ability to say that every patient in the practice received unnecessary hysteroscopies. Trial Tr. (Dec. 9, 2025) at PageID 8647–48. And Dr. Seidman could not say whether the files shown to him had been hand-selected to include repeated-biopsy patients. Trial Tr. (Dec. 17, 2025) at PageID 4204–05.

That is the opposite of extrapolation.

Extrapolation is reliable only when the subset is shown to be representative of the larger universe. A subset chosen because it contains charged procedures, repeated biopsies, or other outlier features is not representative; it is enriched for the very characteristic the Government seeks to generalize across all claims. The Sixth Circuit's *Jones* decisions make the point cleanly. In the first appeal, the court vacated a sentencing loss calculation because the government relied on statistical extrapolation without proving that the reduced set of files still formed a representative sample; on remand, the court affirmed only after the government supplied evidence that the remaining files were still statistically reliable and representative. Here, the Government never even cleared the first hurdle. Its own witnesses could not identify any random selection, representative methodology, or sampling protocol at all.

Nor did the Government offer a valid substitute for extrapolation. Bandyopadhyay expressly disclaimed making any global summary, McDonald admitted some hysteroscopies were medically indicated and could not generalize to the practice as a whole, and Farzan's file set was built around charged procedures and targeted additions. Trial Tr. (Dec. 5, 2025) at PageID 8236; Trial Tr. (Dec. 9, 2025) at PageID 8585, 8595, 8647–48; Trial Tr. (Dec. 18, 2025) at PageID 5885–86. Without either a representative sample or claim-by-claim proof across the expanded universe, the Government has not proved by a preponderance that the Court should treat the entire Count 46 dataset as medically unnecessary and nonreimbursable.

If the government maintains that Count 46 is limited to its device theory, their argument still fails under the weight of witnesses testimony. Trinika Cannon testified that clean scopes were kept in the lab room and that once a scope was used, it went to the cleaning area and "a new one out of the lab came to him." Trial Tr. (Dec. 19, 2025) at PageID 6700–01. Dr. Garcia testified

17

that PAC had a washer system, user manuals, drying capability, and "all of the necessary components for high level disinfection." Trial Tr. (Dec. 22, 2025) at PageID 7552–57, 7563. Kumar testified that at least 35 multiuse endoscopes were present on the day of the search, that PAC had two washers, and that he upgraded sinks because the practice was "doing more and more reprocessing of multiuse endoscopes." Trial Tr. (Dec. 23, 2025) at PageID 6844–46. Agent Kriplean, in turn, agreed that "reusable hysteroscope" and "tower" were synonymous in his testimony and that the October 2019 discussion referred to towers. Trial Tr. (Dec. 16, 2025) at PageID 9234–35. On this record, the government did not prove that every Count 46 claim involved a dirty or nonconforming device, much less that every one of those claims was fully nonreimbursable. The Government cannot possibly assert that every patient included in the loss amount received care with a single use scope that was re-used.

This case therefore looks nothing like *Betro*'s "shots-for-pills protocol," where the Sixth Circuit held that separating legitimate from fraudulent claims was not reasonably practicable. *Betro*, 115 F.4th at 455–56. Here, the government's own data are overinclusive, some procedures plainly had legitimate medical value, some claims were reviewed by payors, some equipment was multiuse and reprocessed, and the patient-specific verdicts were mixed. That is exactly the kind of record on which a whole-billings shortcut is improper. *See Jones*, 641 F.3d at 712; *Lovett*, 764 F. App'x at 460; *Clay*, 162 F.4th at 774–75; *Mehmood*, 742 F. App'x at 940–41.

The government's own restitution numbers illustrate the gap between proven paid-program loss and the gross-billing theories now offered for enhancement purposes. In ECF No. 348, the government asserted restitution of '$941,934.64' to Medicare and '$4,939,908.64' to Medicaid, or '$5,881,843.28' combined. ECF No. 348, ¶ 16, at PageID 10099. Kumar does not concede that figure is the correct loss calculation. But it underscores how far the PSR's

18

'$81.44 million' figure and the government's '$37.38 million' fallback depend on disputed assumptions rather than on a claim-level showing.

The Court should reject the PSR's +24 loss enhancement. The present record does not prove more than $65 million, or even more than $25 million, in reliably calculated loss. At minimum, the Court should require a claim-level recalculation or an evidentiary hearing before adopting any loss figure above the specifically proved claims.

### III.    The PSR's +2 Victim/Substantial-Financial-Hardship Enhancement Under Sec. 2B1.1(b)(2)(A)(i) Should Be Rejected.

The offense did not involve 10 or more guideline-defined victims or caused substantial financial hardship to one or more victims.

For Sec. 2B1.1, a "victim" is either a person who sustained part of the actual loss determined under subsection (b)(1) or an individual who sustained bodily injury as a result of the offense. U.S.S.G. Sec. 2B1.1 cmt. n.1 (2025). Substantial financial hardship turns on individualized consequences such as insolvency, bankruptcy, loss of savings, major employment changes, relocation, or harm to credit. U.S.S.G. Sec. 2B1.1 cmt. n.4(F) (2025). The Court may not presume those findings just because the government claims that a patient is a 'victim'.

The PSR's treatment of this enhancement is facially inadequate. Paragraph 109 states that there were approximately 1,000 victims and that one or more experienced substantial financial hardship, but it identifies no specific victim and no supporting facts satisfying Note 4(F). Final PSR ¶ 111.. The government's position paper tries to fix the problem by asserting "at least 5,160 victims" because that many Medicare and Medicaid patients received a hysteroscopy during the Count 46 period. ECF No. 348, ¶ 6, at PageID 10094, 10096. The Government seems to believe that claiming its request is conservative obviates the need for the specific inquiry required by the Guidelines Manual.

19

But being a billed patient is not the guideline test. If victim status is being measured by actual monetary loss, the patients are not automatically victims merely because claims were submitted in their names. The only quantified monetary victims the government has identified with any precision are Medicare and Medicaid themselves. And if the government instead tries to proceed under the bodily-injury prong, it still has to prove bodily injury "as a result of the offense," not just exposure to alleged risk, emotional distress, or outrage about the charged conduct. U.S.S.G. Sec. 2B1.1 cmt. n.1 (2025). The government has not shown that 10 identifiable patients, much less 5,160, suffered guideline-defined bodily injury as a result of the offense conduct proved here.

Nor does recent Sixth Circuit law excuse that proof. In *Wala*, the court permitted a reasonable inference that at least six additional end users suffered pecuniary harm from a 16.1 million-pill counterfeit-drug operation because the record showed the defendant intended deception of downstream purchasers and those purchasers paid money for worthless counterfeit drugs. 166 F.4th at 603–04. *Wala* did not authorize counting an entire population of medical patients as victims without proving whether each counted person suffered actual monetary loss or bodily injury within the guideline definition.

The substantial-financial-hardship branch fares no better. The guideline looks to concrete consequences such as insolvency, bankruptcy, substantial loss of savings, major employment changes, relocation, or credit harm. U.S.S.G. Sec. 2B1.1 cmt. n.4(F) (2025). The government admitted in its own position paper that individual victim restitution claims had not yet been verified and asked that individual-victim restitution remain open for 90 days after sentencing. ECF No. 348 at PageID 10099. That concession is impossible to reconcile with a present finding that one or more identified victims already satisfy the guideline's substantial-financial-hardship

20

standard. If the government has not yet verified which claimed monetary injuries were actually caused by Kumar's conduct, it cannot simultaneously prove substantial financial hardship by a preponderance of the evidence.

To the extent the government relies on emotional trauma, anxiety, or later reluctance to seek medical care, those may be arguments under 18 U.S.C. Sec. 3553(a). They are not substitutes for the victim definitions that the Guidelines actually use. U.S.S.G. Sec. 2B1.1 cmt. nn.1, 4(F) (2025).

The Court should reject the PSR's '+2' enhancement under Sec. 2B1.1(b)(2)(A)(i) because the government has not proved either 10 or more guideline-defined victims or substantial financial hardship to one or more victims.

### IV.    The PSR's +4 Government-Health-Care-Program Enhancement Under Sec. 2B1.1(b)(7)(B)(iii) Cannot Stand on This Record.

The Government cannot prove that a loss to a government healthcare program exceeded $20 million.

Section 2B1.1(b)(7)(B)(iii) adds four levels if the defendant was convicted of a federal healthcare offense involving a government healthcare program and the loss under subsection (b)(1) to that program exceeded $20 million. U.S.S.G. Sec. 2B1.1(b)(7)(B)(iii) (2025).

This enhancement is derivative of the loss calculation. The government uses the same overinclusive hysteroscopy-billing figure for both enhancements. ECF No. 348 at PageID 10096. If the government's loss methodology fails under Sec. 2B1.1(b)(1), its Sec. 2B1.1(b)(7) theory fails with it. And the government has not proved a program loss above $20 million by any independent method.

Again, the only concrete program-loss numbers the government itself has offered are the claimed restitution figures of '$941,934.64' for Medicare and '$4,939,908.64' for Medicaid.

21

ECF No. 348 at PageID 10099. Kumar disputes those numbers as a final loss calculation, but they are nowhere near the '$20 million' threshold for the four-level enhancement. The government's effort to bridge that gap simply recycles the same all-claims, all-patients, all-hysteroscopies theory that the record does not support.

Because the government has not proved a reliable program loss above $20 million, the PSR's +4 enhancement under Sec. 2B1.1(b)(7)(B)(iii) should be rejected.

**V.      The PSR's +2 Enhancement for Conscious or Reckless Risk of Death or Serious Bodily Injury Under Sec. 2B1.1(b)(16)(A) Should be Rejected.**

The alleged offenses did not involve the conscious or reckless risk of death or serious bodily injury.

Section 2B1.1(b)(16)(A) adds two levels if the offense involves "the conscious or reckless risk of death or serious bodily injury." U.S.S.G. Sec. 2B1.1(b)(16)(A) (2025). "Serious bodily injury" means an injury involving extreme physical pain, protracted impairment of a bodily function, or medical intervention such as surgery or hospitalization. U.S.S.G. Sec. 1B1.1 cmt. n.1(L) (2025). The Sixth Circuit recently held that no actual injury is required, but the risk must be "actual, not conjectural," and it noted that the Circuit has not yet resolved whether the enhancement requires subjective awareness of the risk. *United States v. Wala*, 166 F.4th 583, 605–06 (6th Cir. 2026); *United States v. Sosa-Baladron*, 800 F. App'x 313, 330 (6th Cir. 2020).

The government's risk theory again depends on universal assumptions it never proved. It says all Count 46 patients underwent procedures with dirty or improperly reprocessed devices and therefore faced infection or other serious harm. But the record did not establish that all relevant procedures used dirty or nonconforming devices. Cannon testified that clean scopes were kept in the lab and that used scopes were sent to a cleaning area while "a new one out of the lab came to him." Trial Tr. (Dec. 19, 2025) at PageID 6700–01. Garcia described the washer

system, manuals, drying, and other components needed for high-level disinfection, and concluded that PAC had "all of the necessary components for high level disinfection." Trial Tr. (Dec. 22, 2025) at PageID 7552–57, 7563. Kumar testified that PAC had at least 35 multiuse endoscopes, two washers, and upgraded sinks to support in-room reprocessing. Trial Tr. (Dec. 23, 2025) at PageID 6844–46.

The government also cannot turn contested evidence into a conclusive risk finding.

During the jury-instruction conference, the Court declined to give the requested false-exculpatory-statement instruction regarding Kumar's Marr/Cidex statements because there was "some evidence on the other side as to what the devices were doing in the Cidex," the issue was "contested," and the Court was "not comfortable" instructing the jury that the statements were false exculpatory statements. Trial Tr. (Dec. 22, 2025) at PageID 7516–19. That record undercuts any effort to treat the same disputed Cidex theory as settled fact for a sweeping risk enhancement.

The *mens rea* requirement is equally problematic for the government. *Wala* expressly observed that the Sixth Circuit has not yet resolved whether the defendant must actually appreciate the risk or whether a lower recklessness standard is sufficient. *Wala*, 166 F.4th at 605–06. Here, Kumar testified that office hysteroscopes were semi-critical instruments and that high-level disinfection in the office setting was, in his view, the standard of care. Trial Tr. (Dec. 23, 2025) at PageID 6812. Even if the Court ultimately rejects that testimony, it still undermines any facile conclusion that Kumar subjectively appreciated and disregarded a risk of death or serious bodily injury across the entire Count 46 period. This, coupled with the Government's inability to find a single patient that received infection due to alleged conduct, makes this offense

23

one of disagreement amongst available cleaning methodologies not a case in which Dr. Kumar recklessly disregarded a known risk.

In short, the government has proved at most a sharply disputed theory of regulatory noncompliance and contaminated-device use in some settings. That is not the same thing as proving, by reliable evidence, that Kumar's offense conduct involved an actual, nonconjectural risk of death or serious bodily injury as the Guidelines define it.

The Court should reject the PSR's +2 enhancement under Sec. 2B1.1(b)(16)(A).

## VI. The Vulnerable-Victim Enhancements Under Sec. 3A1.1(b)(1) and (b)(2) Should Be Rejected.

The record does not support the PSR's +2 vulnerable-victim enhancement or the government's additional +2 enhancement for a large number of vulnerable victims.

Section 3A1.1(b)(1) applies only if the defendant knew or should have known that a victim was a vulnerable victim, meaning a victim who was "unusually vulnerable due to age, physical or mental condition, or who is otherwise particularly susceptible to the criminal conduct." U.S.S.G. Sec. 3A1.1(b)(1), cmt. n.2 (2025). Section 3A1.1(b)(2) adds two more levels if the offense involved a large number of vulnerable victims. *Id*. Sec. 3A1.1(b)(2). The vulnerability must be unusual, not just characteristic of the ordinary victim class.

The government's position paper rests on generalizations, not individualized findings. It argues that Kumar preyed on women during gynecologic care, that many had low health literacy, and that some patients had learning disabilities or other barriers. ECF No. 348, ¶ 12, at PageID 10097. Even accepting those points for present purposes, they do not show that the patient population as a class was "unusually vulnerable" within the meaning of Sec. 3A1.1.

The commentary's own examples show why the government's theory overreaches. The enhancement fits a fraud involving an ineffective cancer cure or a robbery of a selected

24

handicapped victim; it does not fit a mass fraud merely because one victim happened to be senile, and a bank teller is not vulnerable solely by virtue of the teller's job. U.S.S.G. Sec. 3A1.1 cmt. n.2 (2025). Ordinary physician-patient trust is therefore not enough. If every patient who relied on a doctor were automatically a vulnerable victim, then Sec. 3A1.1 would apply in virtually every medical-fraud case and would do no real work separate from the offense conduct itself or from the abuse-of-trust enhancement. The Guidelines do not permit that collapse. The question is not whether patients were vulnerable in the colloquial sense; it is whether the government proved unusual vulnerability that made these victims particularly susceptible to the charged criminal conduct.

The government's proof does not do that. Its theory depends almost entirely on the same 5,160-patient headcount used for its loss and victim arguments. But nothing in the record proves that each person in that universe was unusually vulnerable rather than simply an ordinary patient seeking gynecologic care. Nor has the government shown that the offense succeeded because of some special vulnerability, as opposed to the ordinary fact that patients trust their treating physician and present with symptoms that require evaluation.

The government's additional request under Sec. 3A1.1(b)(2) is even weaker. A "large number" enhancement cannot be built from the same unsupported all-patients theory that fails elsewhere. Without a reliable finding that the persons being counted were in fact vulnerable victims under Sec. 3A1.1(b)(1), there is no basis for the extra two levels under subsection (b)(2).

Neither the PSR's +2 enhancement under Sec. 3A1.1(b)(1) nor the government's additional +2 enhancement under Sec. 3A1.1(b)(2) should apply.

VII.    **The PSR's +2 Abuse-of-Trust/Special-Skill Enhancement Under Sec. 3B1.3 Should Be Rejected.**

25

Dr. Kumar did not abuse a position of trust or use a special skill in a manner that significantly facilitated the offense.

Section 3B1.3 applies if the defendant "abused a position of public or private trust, or used a special skill, in a manner that significantly facilitated the commission or concealment of the offense." U.S.S.G. Sec. 3B1.3 (2025). Doctors plainly possess a "special skill." *Id*. cmt. n.4. The Sixth Circuit has also recognized that healthcare providers may occupy a position of trust with respect to insurers when they exercise professional discretion over claims. *See United States v. Bryant*, 849 F. App'x 565, 573–74 (6th Cir. 2021). But if the adjustment is based solely on special skill, it may not be stacked with Sec. 3B1.1. U.S.S.G. Sec. 3B1.3 cmt. n.4 (2025).

The Court should not treat physician status alone as sufficient. If being a licensed doctor automatically triggered Sec. 3B1.3 in every healthcare-fraud case, the enhancement would have no limiting principle. The Court must identify a distinct abuse of trust or distinct use of special skill that significantly facilitated the offense beyond the basic fact that Kumar was a physician.

The government's theory blurs that line. Its patient-trust rhetoric is largely a Sec. 3553(a) argument, not a clean Sec. 3B1.3 argument. Patient trust is inherent in medical care. And the fraud theory the government actually litigated turned on billing data, claim coding, device-regulation compliance, and disputed medical necessity, not on some hidden fiduciary control over victim assets. *Bryant* involved claims for services that were never performed or were not performed as billed. *See Bryant*, 849 F. App'x at 572–73. Here, by contrast, the central sentencing disputes are whether the government proved medical non-necessity and device noncompliance across a much broader claim universe than the specific executions proved at trial. A mere contractual or billing relationship with a payor does not create the fiduciary trust the enhancement requires. *See United States v. Ragland*, 72 F.3d 500, 502–03 (6th Cir. 1996)

(abuse-of-trust enhancement requires a position of trust with respect to the victim of the crime, not merely a relationship arising from the fraud); *United States v. Tatum*, 518 F.3d 369, 374–75 (6th Cir. 2008) (the enhancement is reserved for those who occupy a genuine position of trust akin to a fiduciary, not for every defendant whose job facilitated the offense). Because the government's theory rests on Kumar's professional status and his ordinary billing relationship with Medicare and Medicaid rather than any distinct fiduciary discretion he abused, *Ragland* and *Tatum* foreclose the abuse-of-trust prong here.

At minimum, if the Court believes some Sec. 3B1.3 rationale exists, it should refuse to premise the enhancement solely on Kumar's training or licensure because the government separately seeks a Sec. 3B1.1(a) aggravating-role enhancement. The commentary forbids stacking Sec. 3B1.3 with Sec. 3B1.1 when the Sec. 3B1.3 theory is only special skill. U.S.S.G. Sec. 3B1.3 cmt. n.4 (2025).

The Court should reject the PSR's +2 enhancement under Sec. 3B1.3. Alternatively, if the Court is inclined to apply some version of this adjustment, it should not do so on a pure special-skill theory while also considering Sec. 3B1.1.

## VIII.    The Government's Requested +2 Enhancement Under Sec. 2B1.1(b)(9)(C) for Alleged Violation of a Prior Administrative Process Should Be Rejected.

Dr. Kumar's alleged failure to obtain FDA 510(k) clearance before reprocessing single-use devices does not qualify as "a violation of any prior ... administrative ... process" under Sec. 2B1.1(b)(9)(C).

Section 2B1.1(b)(9)(C) applies when the offense involved "a violation of any prior, specific judicial or administrative order, injunction, decree, or process not addressed elsewhere in the guidelines." U.S.S.G. Sec. 2B1.1(b)(9)(C) (2025). The commentary explains that the enhancement targets fraud committed "in contravention of a prior, official judicial or

27

administrative warning, in the form of an order, injunction, decree, or process, to take or not to take a specified action." *Id*. cmt. n.8(C).

The government's theory does not fit the guideline. It does not identify any prior FDA warning letter, consent decree, inspectional finding, Board order, corrective-action directive, or agency command previously directed to Kumar or PAC. Instead, it cites the generally applicable 510(k) premarket-notification regulations and argues that Kumar should have invoked that process before changing the use of the devices. ECF No. 348 at PageID 10096–97.

That is not what Sec. 2B1.1(b)(9)(C) covers. A generally applicable regulatory regime is not a "prior, specific" administrative order, injunction, decree, or process previously directed to the defendant. If it were, every regulatory offense would automatically trigger this enhancement, and the limiting language of Sec. 2B1.1(b)(9)(C) would do no work. The commentary makes clear that the enhancement is reserved for contravention of a prior official warning to take or not take a specified action. U.S.S.G. Sec. 2B1.1 cmt. n.8(C) (2025). The government has identified no such warning here.

The government's own proof on this subject confirms the mismatch. Dr. Nandy described the general FDA mechanism by which an end user who wishes to reuse a single-use device may seek third-party 510(k) clearance and the labeling that would be required if such clearance were obtained. Trial Tr. (Dec. 15, 2025) at PageID 9092–94. That is general regulatory testimony. It is not evidence that FDA had already issued Kumar or PAC a prior official warning, order, injunction, decree, or process directing them to take or not take a specified action before the charged conduct.

There is a second problem. The government's theory depends on the contested premise that Kumar or PAC became a "manufacturer" within the meaning of the cited FDA regulations.

But even if that merits theory were accepted, it still would not establish the separate element that Kumar violated a prior specific administrative order or process directed to him before the offense conduct at issue.

The requested +2 enhancement under Sec. 2B1.1(b)(9)(C) should be rejected.

IX.   **The Government's Requested +4 Aggravating-Role Enhancement Under Sec. 3B1.1(a) Should Be Rejected.**

Dr. Kumar was not an organizer or leader of criminal activity involving five or more participants or that was otherwise extensive.

Section 3B1.1(a) requires proof that the defendant was an organizer or leader of criminal activity involving five or more participants or that was otherwise extensive. U.S.S.G. Sec. 3B1.1(a) (2025). A participant is a person who is criminally responsible for the commission of the offense, even if not convicted. *Id*. cmt. n.1. The defendant must have exercised control over at least one participant in a supervisory, managerial, leadership, or organizational capacity. *United States v. Gort-Didonato*, 109 F.3d 318, 321 (6th Cir. 1997); *United States v. Christian*, 804 F.3d 819, 824 (6th Cir. 2015). A participant must be "aware of the criminal objective" and knowingly offer assistance. *United States v. Anthony*, 280 F.3d 694, 698 (6th Cir. 2002). Even under the "otherwise extensive" prong, the court must assess whether the operation was the functional equivalent of one involving five criminally responsible participants. *Id*. at 699–701.

The government's proof does not satisfy those requirements. It describes a large clinic, a high number of patients, and employees whom Kumar allegedly trained. ECF No. 348, ¶ 13, at PageID 10098. But size is not participant proof. Unwitting employees, billers, students, and staff do not become Sec. 3B1.1 participants merely because they worked in the practice.

29

The record is full of evidence that many of the people around Kumar were not criminally knowledgeable participants. Melissa Lovorn, an independent-contractor biller, testified that she was never told to bill a certain procedure code for every patient, was never told to bill numerous codes for patients' first visits, and was never ordered to add anything not supported by the medical record. Trial Tr. (Dec. 15, 2025) at PageID 9035. Emily Sells testified that either Huda Alaeddin or Dr. Kumar told her during training that every new patient gets a hysteroscopy and biopsy, but she also testified that the supposed protocol was "unwritten" and that, after she stopped following it, Kumar did not specifically tell her to do more hysteroscopies. Trial Tr. (Dec. 16, 2025) at PageID 9387–90, 9410. That is not the same thing as proof that these staff members knowingly joined a criminal plan. Those are not the facts of a proven leadership hierarchy of criminally responsible participants.

Nor has the government identified five criminally responsible participants. It points generally to "employees" and "medical providers under him," but it never shows that at least one, much less five, knew the criminal objective and knowingly joined it. Under *Anthony*, that is indispensable. 280 F.3d at 698.

The "otherwise extensive" prong does not rescue the request. *Christian* and *Gort-Didonato* require control over co-participants, not merely management of property or a large clinic. *Christian*, 804 F.3d at 824; *Gort-Didonato*, 109 F.3d at 321. *Anthony* likewise instructs that the court must determine whether the scheme was the functional equivalent of one involving five criminally responsible participants. *Anthony*, 280 F.3d at 699–701. So the government's evidence that PAC was a busy clinic and treated many patients does not establish a Sec. 3B1.1(a) leadership enhancement by itself. *Clay*, in turn, underscores that remand is

30

required when the factual basis for a leadership enhancement is unclear or unexplained. *See*

*Clay*, 162 F.4th at 778–79.

The government has not proved the participant element required by Sec. 3B1.1(a), and

the requested +4 aggravating-role enhancement should be rejected.

**X.     The Government's Requested +2 Obstruction Enhancement Under Sec. 3C1.1
Should Be Rejected.**

Section 3C1.1 applies only if the defendant willfully obstructed or attempted to obstruct

the administration of justice with respect to the investigation, prosecution, or sentencing of the

offense. U.S.S.G. Sec. 3C1.1 (2025). When the government relies on alleged perjury, the Court

must make findings that encompass falsity, materiality, and willful intent to deceive. *United

States v. Dunnigan*, 507 U.S. 87, 94–95 (1993). While a single finding encompassing those

predicates can suffice under *Dunnigan*, the Sixth Circuit requires findings specific enough to

permit meaningful review, and it has reversed obstruction enhancements where the sentencing

court failed to identify the allegedly false testimony or to find materiality and willful intent.

*United States v. Roberts*, 919 F.3d 980, 990 (6th Cir. 2019); *United States v. Warner*, 646 F.

App'x 478, 480–81 (6th Cir. 2016) (reversing where the district court did not identify the false

testimony or find materiality and willful intent); *United States v. Chance*, 306 F.3d 356, 390 (6th

Cir. 2002) (court may adopt the government's proffered list of perjurious statements only where

the record clearly shows it independently adopted that version of events).

The government's obstruction theory is a collection of disputed accusations, not a proved

enhancement. It cites one ambiguous witness interaction, multiple supposed instances of perjury,

an alleged false statement to Marr, a speculative "staged clinic" theory, and an assertedly false

statement to probation. ECF No. 348,  ¶ 7, at PageID 10094–96. Those points must be separated

and proved individually.

The Gayla Cheathem exchange is too equivocal to carry a witness-intimidation finding on this record. Cheathem testified that Kumar said "he has a practice and I don't" before her grand jury testimony, and that she interpreted that as "Watch what I say." Trial Tr. (Dec. 3, 2025) at PageID 1908–09. That testimony is not flattering, but it is still an ambiguous remark. The government has not shown that Kumar asked Cheathem to lie, not appear, withhold evidence, or alter specific testimony.

The government's perjury allegations run headlong into *Dunnigan* and *Roberts*. Disbelief of a defendant's testimony is not enough. The court must find each element of perjury—falsity, materiality, and willful intent—rather than rest on the jury's verdict or its own credibility impression, and its findings must be specific enough for meaningful review. *Roberts*, 919 F.3d at 990; *Warner*, 646 F. App'x at 480–81; *Dunnigan*, 507 U.S. at 94–95. Here, many of the cited statements concern sharply contested trial issues. For example, the government says Kumar lied when he denied reusing devices from Cidex and described devices under the sink as trash. But during the jury-instruction conference, the Court specifically recognized that there was "some evidence on the other side as to what the devices were doing in the Cidex," found the issue "contested," and declined to give the government's requested false-exculpatory instruction on that point. Trial Tr. (Dec. 22, 2025) at PageID 7516–19. The same record makes it improper to deem the testimony obviously perjurious at sentencing without detailed findings.

The specific testimony the government cites also had evidentiary support. Kumar testified that devices in Cidex under the sink were "basically trash," that the devices in an old bucket were awaiting discard, that he never pulled a device out of Cidex and reused it on a patient, and that he would "absolutely not" reuse a single-use grasper on a patient. Trial Tr. (Dec. 23, 2025) at

32

PageID 6903–04, 6918–20. Whether the jury accepted those explanations is a different question from whether the Court can label them perjury without the required *Dunnigan* findings.

The government's claim that Kumar lied by denying a universal hysteroscopy protocol is similarly overstated. Emily Sells testified that either Huda Alaeddin or Dr. Kumar told her during training that every new patient gets a hysteroscopy and biopsy, but she also testified that the supposed protocol was "unwritten" and that she could not recall a specific instance when Kumar later told her to do more hysteroscopies after she stopped following it. Trial Tr. (Dec. 16, 2025) at PageID 9387-90, 9410. That is not the sort of unequivocal contradiction that makes a perjury finding automatic.

The "staged clinic" allegation is weaker still. Dr. Garcia acknowledged that photos from her October 2025 visit differed from search-warrant photos and that she did not see certain setups later shown in the search photographs. Trial Tr. (Dec. 22, 2025) at PageID 7587–89. But that does not prove who changed the clinic, when anything changed, or that Kumar staged the clinic with intent to mislead. Garcia also admitted she could not identify every device in the search-warrant photos. *Id*. at PageID 7589-91.

Finally, the probation-officer statement does not clearly establish willful material falsity. The government says Kumar told probation he closed the clinic because media coverage made him feel unsafe, whereas the government contends he closed it because of release conditions. ECF No. 348,¶ 7,at PageID 10095-96. But those propositions are not necessarily mutually exclusive, and the government has not shown that the statement was materially false rather than incomplete or self-serving.

33

The government has not carried its burden under Sec. 3C1.1. The requested obstruction enhancement should be rejected absent specific, independent findings that satisfy *Dunnigan* and *Roberts*.

**XI.     Restitution Also Must Be Limited to Proven Actual Program Losses.**

The issue before the Court is whether the government may obtain restitution for all hysteroscopy claims and all attendant services on the theory that Medicare and Medicaid would not have paid any visit containing a medically unnecessary or regulatory-noncompliant procedure.

Restitution must reflect actual loss caused by the offense, not a windfall. *See* 18 U.S.C. Sec. 3663A; *Clay*, 162 F.4th at 773–75. In the healthcare-fraud setting, legitimate medical claims are not losses and must be separated from illegitimate claims. *Id*. at 774–75. And even in scheme cases, restitution may extend only to losses attributable to the precise scheme of conviction. *Jones*, 641 F.3d at 714–15.

The government's restitution request is derivative of the same loss theory already discussed. It seeks '$941,934.64' for Medicare and '$4,939,908.64' for Medicaid, plus potential additional individual-victim restitution, on the theory that the programs would not pay any medically unnecessary or noncompliant claim and would not pay attendant services on the same visit either. ECF No. 348, ¶ 16, at PageID 10099. But *Clay* forecloses that shortcut. The government still must show which claims were actual losses rather than medically necessary claims the programs would have paid anyway. *Clay*, 162 F.4th at 773–75.

The same problems persist here: the government has not claim-matched medical necessity across the Count 46 universe, its summary data are overinclusive, its device theory is not universal, and some procedures plainly had legitimate medical value. It therefore cannot

simply attach every hysteroscopy claim, much less every "attendant" service on the same visit, to a restitution order without a claim-level causation showing.

Any restitution order should be limited to specifically proved actual program losses after the Court separates legitimate medical value from fraudulent claims.

## XII.    Conclusion

The Court should reject the government's attempt to sentence Kumar as though the verdict established a universal all-patients fraud. The indictment, the charge, the verdict form, the Rule 29 record, and the trial proof do not support that position. On the present record, the Court should:

1. Reject the government's Count 46 all-patients loss theory.

2. Reject the PSR's '+24' loss enhancement.

3. Reject the PSR's '+2' victim / substantial-financial-hardship enhancement.

4. Reject the PSR's '+4' government-health-care-program enhancement.

5. Reject the PSR's '+2' risk-of-death-or-serious-bodily-injury enhancement.

6. Reject the PSR's '+2' vulnerable-victim enhancement and the government's requested additional '+2 under Sec. 3A1.1(b)(2).

7. Reject the PSR's '+2' abuse-of-trust / special-skill enhancement.

8. Reject the government's requested '+2' enhancement under Sec. 2B1.1(b)(9)(C).

9. Reject the government's requested '+4' aggravating-role enhancement.

10. Reject the government's requested '+2' obstruction enhancement.

11. Limit restitution to specifically proved actual loss.

At minimum, if the Court concludes that additional fact finding is necessary on any disputed guideline issue, it should require an evidentiary hearing and claim-level proof under U.S.S.G. Sec. 6A1.3 rather than adopting the PSR and the government's allegations wholesale.

Respectfully submitted,

Dated: June 30, 2026

s/ *Ronald W. Chapman II*
Ronald W. Chapman, II (pro hac vice) (Mich. Bar No. P73179)
Chapman, Dowling & Mallek PC
456 E. Milwaukee Ave.,
Detroit, Michigan 48202
T: (346) 242-7626
ron@chapmanandassociates.com

Joseph D. Mallek (pro hac vice)(NY Bar No. 5835442)
Chapman, Dowling & Mallek PC
6201 Fairview Rd., Suite 200
Charlotte NC 28210
T: (346) 242-7626

Lawrence J. Laurenzi (TN BPR No. 9529)
Brian Daniel Mounce (TN BPR No. 39545)
BURCH, PORTER & JOHNSON, PLLC
130 North Court Avenue
Memphis, Tennessee 38103
T: (901) 524-5000

*Attorneys for Dr. Sanjeev Kumar*

## CERTIFICATE OF SERVICE

I hereby certify that on June 30, 2026, I electronically filed the forgoing document with the clerk of court by using the CM/ECF system which will send the notice of electronic filing to all attorneys of record.

s/ *Ronald Chapman, II*
Ronald Chapman, II

36